600 So.2d 1319 (1992)
STATE of Louisiana
v.
Clarence SMITH and Anthony Scire.
No. 89-KA-0001.
Supreme Court of Louisiana.
May 26, 1992.
Thomas L. Lorenzi, Lorenzi & Sanchez, Clive A. Stafford Smith, Numa Bertel, Dwight Doskey, Orleans Indigent Defender Program, Michael L. Fayad, T. Mark Flanagan, Jr., Patrick K. O'Keefe, Victoria A. McEneney, McKenna & Cuneo, Clarence Smith (pro se), for appellants.
Richard Phillip Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Jack Peebles, Asst. Dist. Atty., for appellee.
COLE, Justice.
Defendants Clarence Smith and Anthony Scire were convicted by a jury of first degree murder, in violation of LA.REV.STAT. § 14:30(A)(4),[1] as a result of the killing of Robert Collins. The jury found Scire had procured and paid for the killing and Smith had constructed an explosive device, affixed it to Collins's pick-up truck, and was paid for doing so. In accordance with the jury's recommendation at the penalty phase *1320 of the trial, the court imposed a sentence of death on each defendant.
Smith and Scire now appeal both the convictions and sentences, asserting, cumulatively, some fifty-two assignments of error. Because we conclude a jury instruction by which the trial court attempted to define reasonable doubt violated the Due Process Clause of the 14th Amendment to the United States Constitution and that the error cannot, in this case, be deemed harmless beyond a reasonable doubt, we find it unnecessary to address all but two of the defendants' assignments of error. For the reasons which follow, we reverse the convictions and vacate the sentences as to both defendants and remand the case to the district court for a new trial.

I.
In February 1981, a bomb wired to the undercarriage of a pick-up truck belonging to Robert Collins exploded when he applied the brakes as he was backing out of his driveway onto a public highway in the Algiers section of New Orleans, Louisiana. The blast tore away both of Collins's legs and much of his left hand. He died six hours later as a result of substantial and rapid blood loss. While Collins was lying on his driveway immediately after the bombing, he told a police officer that a Bill Burns was responsible for the explosion.
A few days earlier, Collins had testified in federal court against Burns, who had been indicted, along with Collins and Kenneth Lynn of Miami, Florida, on charges of conspiracy to distribute cocaine. At the time of his death, Collins was scheduled to testify against Lynn, Salvador Salido, an alleged Miami-based drug dealer, and Vincent Marcello and Gary Young, both accused drug traffickers from New Orleans. Subsequent federal investigations of these men failed to uncover any solid physical evidence linking them to Collins's death. The case was deemed "unsolved" until September 1983 when John Joseph "J.J." Hall, the former president of the Outlaws Motorcycle Club chapter in Tampa, Florida, and Carl "Quick Carl" Holley, also an Outlaw member, told federal agents of their involvement in the bombing death of a federal witness in New Orleans two years earlier.
Hall had been arrested in Buffalo, New York, on a fugitive warrant in November 1982, and returned to Jacksonville, Florida, to stand trial with other members of the Outlaws for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. One of the predicate acts charged for the RICO violations involved the drug-related murder of a Richard Earl "Ricky" Jones by Hall and others in Jacksonville in 1978.
Before the jury returned verdicts convicting him of one count of racketeering and one count of conspiracy to commit racketeering activities, Hall had asked his attorney to approach the government with an offer of cooperation. In May 1983, Hall reached an agreement with the United States Attorney for the Middle District of Florida and the Florida State Attorney for the Fourth Judicial Circuit which called for him to plead guilty to a charge of second degree murder in the death of Ricky Jones, to cooperate fully with federal investigators looking into the activities of the Outlaws, and to forfeit his Tampa properties. In return, the federal government promised to place Hall in the Witness Security Program, to seek concurrent sentences on Hall's RICO convictions, to dismiss pending drug conspiracy charges against him, and to forego charging him with any other offense based on his revelations concerning the Outlaws. The Florida State Attorney for the Fourth Judicial Circuit also agreed to forego charges against Hall concerning any past conduct revealed to federal agents. Hall ultimately received concurrent twenty-year terms on his RICO convictions and a concurrent twenty-year term following his guilty plea to second degree murder in the Florida district court.
Hall subsequently underwent a series of "debriefings" with FBI agents, detailing *1321 various crimes committed by him and other members of the Outlaws. These debriefings led to the revelation of the roles Hall and Holley played in the death of Collins. In September 1983, Hall entered into an agreement with the Orleans Parish District Attorney and the Attorney General of the State of Louisiana for complete immunity from prosecution in return for his full cooperation with federal and Louisiana law enforcement authorities.
During this time, Hall wrote to Holley, who was imprisoned in Alabama, advising him to cooperate with the government. Holley then negotiated his own deal with the federal authorities and in September 1983 accompanied federal agents to New Orleans, where he reached an agreement with the Orleans Parish District Attorney and the Attorney General of Louisiana to plead guilty to a charge of manslaughter for the killing of Collins in return for his testimony against the defendants at trial.
At the Orleans Parish District Attorney's office, Holley gave a detailed interview to DEA Special Agent William Dodge, ATF Special Agent Curtis Williams, an Assistant United States Attorney, an FBI agent, an assistant district attorney, and Holley's attorney. Holley then led Dodge, Williams, and NOPD Detective Robert Lambert on a tour of the city to retrace his movements at the time of the murder and to point out locations where certain events had occurred.

II.
Based upon the information provided by Hall and Holley, both Smith and Scire were arrested and charged with the first degree murder of Collins. The state built its case around the testimony of Hall and his "adopted son" Holley.
At trial, Hall described for the jurors how he had run "H.H.H. Enterprises," an unincorporated, Tampa-based confederation involving himself, James "Hawk" Hawkins, and Wilson "Roadblock" Harrell, designed to funnel cocaine either "fronted" by or purchased from defendant Scire, their contact in Hialeah, Florida, to other members of the Outlaws for retail distribution. According to Hall, Hawkins asked Scire in January 1981 if there were jobs the Outlaws could perform to reduce their indebtedness to him. A few weeks later, Hawkins returned to Tampa from a trip to Hialeah with a note upon which was written information concerning Robert Collins. Hawkins and Hall were to "hit" Collins in Algiers. At that time, H.H.H. Enterprises owed defendant Scire approximately $30,000.00. The price for the contract to kill Collins was $12,000.00.
Hall testified he and Hawkins decided to sub-contract the killing to Holley and Richard "Cheezy" Crapparotta, another Outlaw member, for $6,000.00 to be split between the two. Holley and Crapparotta left Tampa for New Orleans carrying various weapons and returned a week later to report they had found Collins but "didn't get a chance to get anything accomplished...." Hall directed Hawkins to relay this information to defendant Scire. Upon his return from Hialeah, Hawkins indicated they had been granted five more days within which to kill Collins. Hall decided to send Holley back to New Orleans, this time accompanied by defendant Smith, a regional president of the Outlaws, rather than Crapparotta. Hall called Ed Lackey, a regional treasurer for the Outlaws living in Jacksonville, Florida, advised him Holley and Smith were on their way to Jacksonville, and told him to give them "weapons, explosives, whatever they needed."[2]
Hall further testified that when Holley and Smith returned to Hall's residence in Tampa, he called Hawkins and told him the contract had been fulfilled. Hawkins, in turn, called Scire who set up a meeting at the Howard Johnson's restaurant on Interstate 75 outside of Ocala, Florida. Hall drove to the meeting accompanied by Smith, Holley, and Carl Harry, a probationary member of the Outlaws, but sat alone *1322 with Scire and Carmen Truseau (or Trusso), Scire's associate, at a separate booth in the restaurant. Hall and Scire discussed the "hit." When Scire asked for verification, Hall told him Holley and Smith had left New Orleans after seeing the results of their mission on a television newscast. Hall then told Scire he would pay Holley and Smith. After discussing the amount of money Hall and Hawkins owed Scire, Hall stated he would deduct the amount of the contract from the balance owed Scire. Subsequent to the meeting, Scire notified Hawkins that "the people were real pleased about New Orleans."
Holley testified after Hall, describing the events in New Orleans. He stated that on his first trip to New Orleans to make the "hit" on Collins, he, accompanied by Crapparotta, scouted Collins's residence and determined his pattern of movement around the city. Because of the presence of witnesses at the time, Holley and Crapparotta abandoned an attempt to shoot Collins in front of his residence. The pair then returned to Tampa. Holley stated Hall subsequently told him they had been granted an extension on the contract and he could attempt the killing again if he wished. Holley agreed to make another attempt.
Holley told the jury that, on his second trip, he was accompanied by defendant Smith at Hall's recommendation. The two left for Jacksonville in a Chevrolet Nova belonging to Hall. When Holley described the layout of Collins's home and truck, defendant Smith suggested they use explosives in the hit. Holley testified Smith told him he (Smith) had "had some experience with explosives from the time he was in the military service." In Jacksonville, Holley and Smith stopped at Ed Lackey's home where they obtained some plastic explosives, a cylinder, and blasting caps. While Holley and Lackey observed, Smith and a man called "Fuzzy" tested the blasting caps at the back of Lackey's property by burying one in the ground and firing it. They discovered the cap worked on a delay of a few seconds after it was energized from a battery source.[3]
After approximately two hours in Jacksonville, Holley and Smith left for New Orleans. En route, they stopped at various truck stops to purchase supplies, such as alligator clips and a pair of rubber gloves, needed to wire the detonators. Just before entering Louisiana, Holley and Smith stopped in a roadside rest area and partially assembled the bomb. Upon their arrival in New Orleans, they checked into a motel in New Orleans East for a few hours and then drove to Algiers to give Smith an opportunity to determine the layout of Collins's residence. That night, Holley and Smith returned to Algiers to survey the area. Once there, however, the two decided to proceed with the plan. While located down the street from Collins's house, they finished assembling the bomb. Smith then took the bomb, walked to Collins's residence, attached the bomb to the undercarriage of Collins's truck, and wired it so it would detonate when Collins engaged the brakes. Meanwhile, Holley drove around the block several times making short stops. When Smith had finished, he began to walk away from the residence along the highway, where Holley picked him up. The two then returned to the motel and waited until the next morning for news of the bombing on television.
Upon their return to Tampa, Hall gave Holley a bag containing $6,000.00 in cash, half of which Holley gave Smith. Later, Holley accompanied Hall on the trip to Ocala as security. He recalled the meeting had taken place at a Stuckey's Restaurant outside Ocala and confirmed he had sat at a separate table during Hall's discussion with the two men Hall met there. Holley also testified he had left behind a note telling his girlfriend, Debra Corbett, he would be out-of-town for a few days around the time of the bombing. This note was obtained by the FBI and entered into evidence at trial.
*1323 The state introduced Hall's written agreements with the federal prosecutors in Florida and the state officials in Louisiana. As described by Hall in his testimony, the agreements called for "drop[ping] that one indictment at Tampa, for the drug conspiracy, and I wouldn't be prosecuted for anything I told them about me." Hall acknowledged he had been convicted on the two RICO counts and had entered a guilty plea to second degree murder in Florida for the death of Ricky Jones. "He was another drug dealer," Hall explained, "he ripped us off." Hall attributed the fatal shot to a Kenneth Hart, but admitted under cross-examination he had fired seven times into Jones's body. Hall estimated he had undergone thirty to forty debriefings since May 1983 and in those sessions he detailed a life of crime stretching back to 1969, a point emphasized by the defense on cross-examination. Cross-examination also emphasized the similarity in Hall's business-like approach to the killing of Collins, whom he did not know, and for whom he had no personal animosity, and to saving as much of his life as he could reclaim.
Hall denied he had killed as many as six or seven people, but he did admit to three murders: Ricky Jones, Robert Collins, and John Marsh. The murder of Marsh occurred in Jacksonville, Florida, as an act of revenge for the victim's alleged rape of two Outlaw "wives." Hall shot Marsh three times or "[m]aybe four." Hall committed that murder in 1974 and had never been prosecuted for it.
Holley revealed his rather sordid past as well. He was sentenced to a total of thirty years on the two RICO counts. His testimony made clear the RICO convictions included his interstate prostitution activities in Mississippi. He had also spent time in the Tennessee state penitentiary for burglary and safe cracking. As for uncharged crimes, Holley told jurors he had committed "a couple" of robberies in 1976 and then, with the help of another Outlaw, had murdered a young woman suspected of working as a police informant. Holley had "cut her up" and tossed her off the Skyway Bridge in Tampa. Holley had also been charged with separate RICO violations in Tampa. He was in jail on those charges when he was transferred to Jacksonville in November 1982 to stand trial with the other Outlaw members, including Hall. Cross-examination of Holley also brought to light another motive for testifying against defendant Smith. Holley admitted he had jumped on another Outlaw member in a fight which began when a drunken Hall spilled cocaine in the Outlaw clubhouse. Smith, the regional president of the motorcycle club, had accused Holley of violating the club rules and "busted [him] down to probate...."
The remainder of the state's case involved the testimony of: various law enforcement officials who testified as to the scene of the crime and their futile efforts to track down leads in solving the crime until Hall and Holley elected to seek the immunity agreements; forensic specialists who detailed the construction of the explosive device; the pathologist who performed the autopsy on Collins's body; other law enforcement agents who recounted their investigation to corroborate Holley's account of the murder; and a neighborhood resident who had heard the sound of an automobile door at about the time Holley indicated he and Smith were in the area and who later observed the scene in Collins's driveway shortly after the explosion.
The state then introduced this evidence, as well as all exhibits admitted in the guilt phase, plus two autopsy pictures of Collins's body, at the penalty phase of the trial. Based upon the fact that it found two aggravating circumstances,[4] and after considering the mitigating circumstances, the jury recommended each defendant be sentenced to death. The court followed the jury's recommendation.
*1324 On appeal, Smith and Scire challenge numerous aspects of both the guilt and penalty phases of the trial. As previously noted, however, because of our resolution of the jury instruction issue, we find it necessary to address only two assignments of error.

III.
Both Smith and Scire contend the state produced insufficient evidence to support a conviction for first degree murder. The state was required to prove: defendants killed, or were principals to the killing of, Robert Collins; they possessed the specific intent to kill or inflict great bodily harm; and they offered, were offered, gave, or received anything of value in exchange for the killing. LA.REV.STAT. § 14:30(A)(4). All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LA.REV.STAT. § 14:24.
When considering a claim of insufficient evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). In making such a determination, a reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Rosiere, 488 So.2d 965, 968 (La. 1986).
Defendant Scire asserts the evidence against him consisted of the uncorroborated testimony of an accomplice, Hall, who had received complete immunity for the offense. He notes Hall's testimony consisted primarily of the out-of-court declarations of an alleged co-conspirator, Hawkins, who, although in custody of the state, was not called to testify. He points out the state did not introduce evidence of a motive. In addition, Scire maintains no evidence was offered to support Hall's assertions that Scire was a cocaine dealer with whom Hall had frequent dealings and to whom Hall owed money.
The credibility of Hall and Holley was the central issue at trial. We believe the jury was provided the essential information regarding their criminal background. Hall testified Hawkins had returned from a trip to meet with Scire with a contract to kill a man named Robert Collins in New Orleans and that the contract was worth $12,000.00 and would be applied toward the money Hall and Hawkins owed Scire for providing them a kilo of cocaine on consignment. Further, Hall testified that following the bombing he met with Scire in Ocala to apprise him of the details of the bombing and to discuss the manner of payment for the contract. Although Holley could not confirm what had been discussed, he did confirm a meeting had taken place in Ocala following the bombing. Given the credibility determinations which it is within the exclusive province of the jury to make, we conclude a rational factfinder, viewing this evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt Scire had intended to kill Robert Collins when he offered a contract on his life to Hall and Hawkins in exchange for forgiving $12,000.00 of their debt and that he had procured Hall and Hawkins to kill Collins. Hall was a forthright witness whose credibility stood or fell on his criminal past.
Defendant Smith asserts that the only evidence against him was the uncorroborated testimony of Hall and Holley. He contends the credibility of these two men, given their past conduct as members of the Outlaws Motorcycle Club, was such that to base his conviction and sentence of death on their testimony alone would be a travesty of justice. He asserts that uncorroborated accomplice testimony cannot be the sole evidence with which a defendant is *1325 convicted and sentenced to death and that corroboration evidence should bear upon that part of the testimony which connects the accused with the crime.
We believe sufficient evidence supported Smith's conviction. Holley stated he and Smith had picked up blasting caps and explosives in Jacksonville; he and Smith had driven to New Orleans, purchasing alligator clips, electrical tape, and wire at various truck stops; he and Smith had constructed a bomb; Smith had attached it to the undercarriage of Collins's truck, wiring the bomb so it would detonate when Collins applied his brakes; and, he and Smith had been paid $3,000.00 each after their return to Tampa. The state corroborated Holley's testimony with physical evidence recovered at the scene, including the alligator clips, tape, and fragments of a particular type of blasting cap. Hall testified he had sent Smith to make the hit on Collins and he had told Smith he and Holley would be paid $3,000.00 each to make the hit in New Orleans.
As previously noted, the credibility of Hall and Holley was the central issue at trial. Consequently, the jury was required to determine whether they believed these two men who had extensive criminal backgrounds including murder and drug distribution. Nevertheless, we conclude the jury was given sufficient information with which to make that determination. In other words, given the apparent credibility determinations made by the jury, a rational trier of fact viewing the evidence in the light most favorable to the prosecution could have found beyond a reasonable doubt Smith specifically intended to kill or inflict great bodily harm on Collins when he attached a bomb to his truck and wired it so it would detonate when Collins applied the brakes, and that Smith had received $3,000.00 for the killing. We conclude, therefore, that the state presented constitutionally sufficient evidence upon which to base the convictions of both defendants.

IV.
Each defendant also contends his rights under the Due Process Clause of the 14th Amendment to the United States Constitution, and under the principles enunciated in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), were violated when the trial court instructed the jury on reasonable doubt. The trial court, during its charge to the jury, stated, in pertinent part:
If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, itis [sic] your sworn duty to give him the benefit of that doubt and return a verdict of acquittal. Even where the evidence demonstrates a probability of guilt, if it does not establish it beyond a reasonable doubt, you must acquit the accused. This doubt must be a reasonable one; that is, one found [sic] upon a real, tangible substantial basis, and not upon mere caprice, fancy pr [sic] conjesture [sic]. It must be such a doubt as would give rise to a grave uncertainty raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendants' guilt. If, after giving a fair and impartial consideration to all of the facts in the case, you find the evidence unsatisfactory upon any single point indispensabley [sic] necessary to constitute the defendants' guilt, thiswould [sic] give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty. A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable person would seriously entertain. It is a serious doubt for which you could give a good reason.
Trial transcript, Supp. Vol. at 686-87 (emphasis added).
We note initially that no objection was made to this instruction at the time it was given. Because this is a capital case, however, we consider issues to which no objection was raised at the trial but which have been assigned as error on appeal. See State v. Smith, 554 So.2d 676, 678 (La.1989) (and cases cited therein).
*1326 The state concedes the jury was instructed using the charge on reasonable doubt found improper in Cage v. Louisiana, 498 U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and that the decision is applicable to this case.[5] Indeed, the instruction is nearly identical to the one found objectionable by the Supreme Court. See id. 498 U.S. at ___, 111 S.Ct. at 329.
On remand from the Supreme Court, we concluded the use of such an instruction is subject to a harmless error analysis under Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). State v. Cage, 583 So.2d 1125, 1127 (La.), cert. denied, 502 U.S. ___, 112 S.Ct. 211, 116 L.Ed.2d 170 (1991). The question becomes, therefore, whether it appears beyond a reasonable doubt that the erroneous instruction did not contribute to the jury's finding of guilt. Cage, 583 So.2d at 1128; see also Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991); State v. Sullivan, 596 So.2d 177, 185 (La.1992); State v. Hamilton, 478 So.2d 123 (La.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); State v. Gibson, 391 So.2d 421 (La.1980).
The state contends the erroneous jury instruction was harmless because the corroborated, firsthand testimony of Hall and Holley proves defendants' guilt beyond a reasonable doubt. It asserts that if a reviewing court finds the trial record establishes guilt beyond a reasonable doubt, the interests of justice have been satisfied and the conviction should be affirmed, citing Rose v. Clark, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986).
Defendants, on the other hand, contend the Cage instruction unconstitutionally lowered the state's burden of proof and was not harmless. They assert it was impossible for them to have received a fair trial under the circumstances. They maintain the court's instruction virtually assured their convictions.
Before we can hold a federal constitutional error harmless, we must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman, supra. We have both the power and the obligation to review the record de novo to determine an error's harmlessness. See id.; see also Arizona v. Fulminante, 499 U.S. ___, ___, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). In so doing, we emphasize we do not make credibility determinations nor do we make findings of fact or usurp the jury's customary function in our legal system. See Rosiere, supra; Gibson, 391 So.2d at 427. Rather, we must determine whether the state has met its burden of demonstrating the erroneous jury instruction did not contribute to defendants' convictions.[6]
In conducting a harmless error analysis, we do not merely excise the error and review the remainder of the record for sufficiency under Jackson v. Virginia, supra. See Cage, 583 So.2d at 1129 (Lemmon, J., concurring). To say an error did not "contribute" to the verdict is not to say the jury was totally unaware of the feature of the trial subsequently held to have been erroneous.[7]Yates, 500 U.S. at ___, 111 S.Ct. at 1893. Rather, it is to find the error unimportant in relation to everything else the jury considered, as revealed in the record. Id.
*1327 We cannot find the erroneous instruction in this case unimportant in relation to everything else the jury considered. The charge equated reasonable doubt with grave uncertainty raised in the minds of the jurors by reason of the unsatisfactory character of the evidence. By reemphasizing that a reasonable doubt must be not only a grave uncertainty but an actual doubt, substantial doubt, or a serious doubt for which a juror could give a good reason, the court firmly implanted in the juror's minds a higher degree of doubt than is required for acquittal under the reasonable doubt standard. A reasonable juror may well have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.
This becomes especially clear when the record as a whole is considered. Although we have determined the evidence to be constitutionally sufficient under Jackson, see supra Section III, we are well aware the Jackson standard serves only as a constitutional minimum for purposes of the Due Process Clause. To say the evidence is of minimal constitutional sufficiency, however, is not to say the erroneous instruction is unimportant in relation to it.
While the testimony of Hall and Holley in this case links both Smith and Scire to the murder of Collins, there is nothing else which does so. Nothing but the testimony of Hall and Holley places Smith in the New Orleans area. The fact that wires and alligator clips were found at the site of the explosion, and the relative ease with which Holley guided the law enforcement officers to Collins's residence, corroborate the fact that Holley was involved in the murder. No hotel records were offered to indicate the presence of two individuals, rather than one, in New Orleans at the time of the killing. No evidence of Smith's alleged expertise with explosives was offered. Neither Ed Lackey nor the mysterious "Fuzzy" was called to verify Holley's account of his and Smith's journey to Jacksonville to obtain the explosives.
There is also no corroboration of the assertion that Scire was involved. Hawkins, who had allegedly dealt with Scire directly, was not called to testify. Rather, the jury heard only the hearsay testimony of Hall about the alleged order to kill Collins. In addition, Holley and Hall could not agree on the location of the post-killing meeting outside Ocala. Holley could not remember who attended the meeting, nor was he privy to the conversation at the meeting, since he sat several booths away.
While the jury was free to make the credibility determinations it made, despite hearing about the extensive criminal backgrounds of Hall and Holley, we cannot say the erroneous jury instruction did not contribute to the jurors' verdict. A rational trier of fact, on this record, may well have credited the testimony to the extent that he or she harbored no grave uncertainty, substantial, actual, or serious doubt. It does not follow, however, that such a rational trier of fact would not have harbored a reasonable doubt.
We cannot measure the intervals between the degrees of doubt the jurors in this case may have entertained.[8] Suffice it to say, however, that we find a close relationship between the trial court's having reinforced, through its charge, a greater doubt than is required, and a case that may be said to be just over the threshold of constitutional evidentiary sufficiency. That being so, the erroneous instruction, under the circumstances, is not unimportant in relation to everything else the jury considered. Because the state has failed to meet its burden of demonstrating the erroneous instruction did not contribute to the jury's finding of guilt, we hold the constitutional error in this case was not harmless, and requires reversal.

V.
For the foregoing reasons, the defendants' convictions are reversed, the sentences *1328 are vacated, and the case is remanded to the district court for a new trial.
CONVICTIONS REVERSED. SENTENCES VACATED. REMANDED TO THE DISTRICT COURT.
LEMMON, J., concurs.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I disagree with the majority's conclusion that defendants' convictions and sentences must be reversed because of the erroneous jury instruction.
The majority relies on State v. Smith, 554 So.2d 676 (La.1989), for the proposition that we will consider issues to which no objection was raised at trial but which have been assigned as error on appeal. Four members of this court, including myself, concurred in Smith. Since the error in Smith was objected to, I found we did not have to reach the issue of when unobjected-to errors would be considered. Further, I distinguished between unobjected-to errors in the penalty phase, believing these errors should be reviewed whether objected to or not in order to determine whether the sentence of death was excessive, and unobjected-to errors in the guilt phase, which I believed should be reviewable only in the context of an ineffective assistance claim. In the present case, the unobjected-to error occurred during the guilt phase. At this phase, the issue of excessiveness of sentence is not yet relevant. The policy behind the contemporaneous objection rule, to put the trial judge on notice of the erroneous instruction so he may cure the problem, is as important in a capital case as in a non-capital case. Accordingly, I believe the majority erred in considering the unobjected-to error in this case.
Secondly, even assuming the unobjected-to error was properly before the court, I believe the majority errs in not finding the error was harmless beyond a reasonable doubt. The majority holds that a rational factfinder, applying the proper standard of reasonable doubt, could have found sufficient evidence to support the convictions, but then concludes that the erroneous instruction was not harmless, since the jury may have credited the testimony using an erroneous standard of reasonable doubt. In State v. Cage, 583 So.2d 1125 (La.1991), we stated:
The state has the burden of demonstrating that the trial error did not contribute to defendant's conviction. If a reviewing court finds that the trial record establishes guilt beyond a reasonable doubt, the interests of justice have been satisfied and the judgment should be affirmed.
While I agree there is more to a harmless error analysis than a review of the record for sufficiency purposes, I believe the state in the present case has met its burden in showing that the corroborated testimony of Hall and Holley establishes defendants' guilt beyond a reasonable doubt. Accordingly, I respectfully dissent.
NOTES
[1] This section provides "[f]irst degree murder is the killing of a human being: ... [w]hen the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing." La.Rev.Stat. § 14:30(A)(4).
[2] Hall asserted Lackey maintained a storehouse of weaponry for the Outlaws on his property.
[3] The state's explosives expert, ATF Special Agent Williams, examined the fragments of the bomb recovered on the scene and discovered that a delay blasting cap had been used.
[4] The jury found: (1) the offender offered or has been offered or has given or received anything of value for the commission of the offense; and, (2) the offense was committed in an especially heinous, atrocious, or cruel manner.
[5] There is no question of retroactive application of the Supreme Court's decision since this case was pending on direct appeal at the time the opinion was rendered.
[6] "There is no difficulty inherent in proof of negative propositions, despite persistent claims to the contrary.... The folklore that a negative proposition is difficult to prove should be rejected." Kevin W. Saunders, The Mythic Difficulty in Proving a Negative, 15 SETON HALL L.REV. 276, 288 (1985).
[7] Indeed, in this case, as in most cases involving jury instructions, it would be untenable to infer the jurors were unaware of the charge. It would run counter to the sound presumption that jurors ordinarily follow the instructions they are given. See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987).
[8] Levels and degrees of doubt are not, as a general proposition, susceptible of precise measurement.