JAMES F. McKAY III, Judge.
 

 ^STATEMENT OF THE CASE:
 

 On September 17, 2008, the defendant was charged with theft over $500.00. On October 3, 2008, the defendant entered a plea of not guilty. On March 11, 2009, the district court found no probable cause to hold defendant for trial. On June 30, 2009, following a bench trial, the defendant was found guilty as charged. On July 7, 2009 and September 28, 2009, the district court denied defense counsel’s motion for a new trial. On July 9, 2009, the district court set a restitution hearing for August 27, 2009; the hearing was continued to August 31, 2009. On that date, defense counsel objected to a restitution hearing being conducted prior to sentencing and noticed his intent to file writs in this Court. Writ 2009-K-1174 was denied by this Court on September 25, 2009. On October 20, 2009, following a restitution hearing, the district court sealed all restitution receipts into the record. On November 6, 2009, the defendant was sentenced to serve five years at hard labor; two years were suspended, and the defendant was placed on two years active probation. The defendant’s motion for an appeal was granted, and the Louisiana Appellate Project was appointed to represent the defendant on appeal.
 

 |2On September 27, 2006, and December 11, 2006, Thomas and Angie Nash entered into two contracts with the defendant (THF Construction). The first contract was to construct an addition to their home at 5127 Easterlyn Circle in eastern New Orleans. The second contract was for renovations to their Hurricane Katrina damaged home which had sustained flood damage. The home had already been gutted. The defendant showed them his contractor’s license and gave them the address to another home that he had renovated. The Nashes agreed to a total price of $162,000.00 for the addition and the main house renovations.
 

 The first contract for the addition called for pilings, a concrete slab with iron rebar and iron mesh, framing, sheetrock, insulation, electrical wiring and tying the addition into the main house. The Nashes agreed to pay the defendant in four installments of $22,860.00 (20%) up front, $22,860.00 (20%) after the foundation was completed, $34,290.00 (30%) after the framing and roofing was completed and $34,290.00 (30%) after satisfactory completion of the addition. The Nashes gave the defendant the first check for $22,860.00 on the date the parties signed the contract. This first payment was to review the plans, acquire the proper insurance, hire the subcontractors and complete the foundation which was to cost $9000.00. The defen
 
 *803
 
 dant agreed to complete the first phase of the addition by December 2006. When the December deadline arrived, the agreed upon work was not completed. The defendant answered the Nashes’ concerns and complaints by telling them that he was having trouble getting the necessary subcontractors to perform the work. It was not until 2007 that the pilings were driven, the concrete slab was completed and the framing was started. The defendant requested the second payment of $22,860.00. However, the Nashes were unable to get the funds from their Mortgage Company until the framing was completed as agreed upon.
 

 |3In the second contract for renovations to the main house, the defendant agreed to treat all the wood for mold, install new windows and doors, install all door and window hardware, insulate all walls and ceilings, sheetrock all walls and ceilings, install all plumbing and plumbing fixtures using a licensed plumber, install all electrical wiring and fixtures using a licensed electrician, install all kitchen cabinets, install all flooring, complete all painting, finish the exterior of the house with matching brick, repair roof and tie into the addition, upgrade downstairs air conditioning compressor and install two new upstairs compressors. In consideration for the agreed upon work yet to be completed, the Nash-es gave the defendant a check in March 2007 for $65,000.00. The defendant told the Nashes that the renovations would be complete in four weeks. The Nashes also gave the defendant a check for $10,000.00 to expedite work to the upstairs of the main house so that the family could live upstairs while the remainder of the work was completed. After the defendant deposited the $65,000.00 check, he installed three windows and three doors with no hardware and hung sheet rock in one room; the sheetrock was not taped or floated as agreed upon. No further work was completed by the defendant.
 

 The Nashes persistently sent e-mails and phone calls to the defendant pleading with him to finish the work; no further work was completed. The total amount of money that the Nashes gave to the defendant totaled $97,860.00. Subsequently, the Nashes learned that the defendant’s business telephone number had been disconnected and his place of business had been vacated. The Nashes also learned that the homeowner of the house the defendant gave them as a reference had fired the defendant for incomplete and substandard work and finished the work himself. They also contacted Torrence Green of Vulcan ^Construction Company to perform a comprehensive analysis to ascertain the dollar value of the work the defendant actually completed up to the time that the Nashes could no longer contact him. Green’s analysis showed that the difference of the cost analysis between the work completed by the defendant and the amount paid to him was $88,000.00. The Nashes eventually hired another contractor to finish the work that they had paid the defendant to complete which included the following: 1) complete the cement slab and tie it into the main slab; 2) complete the installation of all insulation; 3) complete all the brick work; 4) complete the plumbing in the main house and in the addition; 5) complete the roof between the addition and the main house; 6) complete the installation and sealing of the windows; 7) install all door hardware; 8) complete all installation, taping and floating of the sheetrock; 9) install the remaining two air conditioning compressors using a licensed air conditioning contractor; and 10) complete all remaining electrical work using a licensed electrician.
 

 On direct examination, the defendant denied that he received funds for work that
 
 *804
 
 was not completed. He testified that it was impossible to work with Mrs. Nash because she kept changing her mind and choosing materials that cost more than the agreed upon allowance. He opined that the Nashes owed him approximately $11,000.00 for his time and effort in securing the sub-contractors. He also testified that he used his own money to perform some of the work on the Nashes’ house for which he was not reimbursed; he did not produce any documentation to support this claim. On cross-examination, the defendant admitted that he knew that it was illegal to conduct contractor work without a valid license, but he could not remember if he was in good standing with the licensing board when he entered into the contract with the Nashes. The defendant stated that business was good but | ^hiring help was difficult. He admitted that he had other jobs that did not end well and that one homeowner, who had fired him from the job, filed a lawsuit against him for failure to complete the terms of the contract. The defendant also admitted that he had between six and seven consumer fraud complaints filed against him with the attorney general’s office but that he had been exonerated on all complaints.
 

 ERRORS PATENT
 

 A review for errors patent reveals none.
 

 ASSIGNMENT OF ERROR
 

 In his sole assignment of error, the defendant asserts that the evidence was insufficient to support his conviction. Specifically, the defendant argues that the state failed to present expert testimony to prove that the Nashes sustained any financial loss from his actions.
 

 DISCUSSION
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Green,
 
 588 So.2d 757 (La.App. 4th Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would |fido. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mussall,
 
 523 So.2d at 1309-1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.”
 
 State v. Smith,
 
 600 So.2d 1319, 1324 (La.1992).
 

 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 State v. Shapiro,
 
 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from
 
 Jackson v. Virginia,
 
 but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.
 
 State v. Wright,
 
 445 So.2d 1198 (La.1984). All evidence, direct
 
 *805
 
 and circumstantial, must meet the
 
 Jackson
 
 reasonable doubt standard.
 
 State v. Jacobs,
 
 504 So.2d 817 (La.1987). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty.
 
 State v. Captville,
 
 448 So.2d 676 (La.1984).
 

 A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Huckabay,
 
 2000-1082 (La.App. 4 Cir 2/6/02), 809 So.2d 1098;
 
 State v. Harris,
 
 99-8147 (La. App. 4 Cir. 5/31/00), 765 So.2d 432.
 

 The determination of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982);
 
 State v. Butler,
 
 322 So.2d 189 (La.1975). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense.
 
 Jackson v. Virginia; State v. Huizar.
 

 In this case, the defendant was convicted of theft of more than $500.00. The offense of theft is defined in La. R.S. 14:67:
 

 A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
 

 Thus, in order for the defendant’s conviction to be upheld on appeal, the State must have proven the following essential elements beyond a reasonable doubt: 1) that the defendant misappropriated or took by means of fraudulent conduct, practices, or representations; 2) a thing of value; 3) that belonged to another; and 4) that the defendant had the intent to deprive the owner permanently of that which was misappropriated or taken.
 
 State v. Pittman,
 
 368 So.2d 708 (La.1979). The State must further prove the value of the stolen property, for upon this proof depends the determination of the severity of the theft, and the punishment for a convicted offender.
 
 State v. Monterroso,
 
 96-376 (La.App. 5 Cir. 11/14/96), 685 So.2d 249, 251.
 

 Mr. and Mrs. Nash both testified that after the defendant failed to return their calls and e-mails, and they found out that THS Construction Company was no longer in business and the defendant’s license had lapsed, they contacted Torrence Green of Vulcan Construction Company to perform a comprehensive analysis to | ^ascertain the dollar value of the work defendant actually completed up to the time that the Nashes could no longer contact him. Green’s analysis showed that the difference of the cost analysis between the work completed by defendant and the amount paid to him was $38,000.00. This amount was based on the $97,000.00 paid by the Nashes to the defendant for the agreed upon work. Furthermore, the evidence and testimony presented at trial show that after the defendant received the last payment of $65,000.00, he completed three substandard tasks, did not return to the job site to complete the work for which he was paid and did not offer to return the $65,000.00. In addition, after the defendant deposited the funds into his bank account, he stopped returning the Nashes’ telephone calls, disconnected his business telephone and closed his construction company.
 
 *806
 
 Based on the defendant’s actions, a reasonable trier of fact could conclude that the defendant intended to permanently deprive the Nashes of money owed to them in excess of $500.00. This assignment of error is without merit.
 

 CONCLUSION
 

 Based on the above and foregoing we affirm the defendant’s conviction and sentence.
 

 AFFIRMED