JOY COSSICH LOBRANO, Judge.
| following a trial, a jury convicted defendant, Frank E. Haynes, of second degree murder[1] in the death of Barry Jean-marie. The trial court sentenced Haynes to life imprisonment at hard labor, without the benefit of parole. Haynes appealed his conviction and sentence. For the reasons that follow, we affirm.
Reginald Walker testified that on the evening of June 15, 2011, he, his son, Gir-ard Broussard, and Jeanmarie, were hanging out in front of Broussard’s grandfather’s house on the corner of Mazant and Villere Streets. After deciding to buy some beer and snacks, they rode their bicycles to Mike’s Grocery on St. Claude Avenue. Walker rode his own bicycle. Broussard rode Jeanmarie’s bicycle with Jeanmarie seated on the handlebars. When they arrived at the store, Jeanmarie noticed a bicycle outside the store and stated that he wanted to steal it. Walker told Jeanmarie to leave the bicycle alone. Walker went into the store and purchased some beer. When he left the store, Walker saw Jeanmarie riding on the handlebars of his bicycle. However, after Walker crossed the street and looked back, he no *1085 longer saw Jeanmarie on his bicycle. Je-anmarie had apparently taken |2the bicycle that was outside the grocery store. While Walker was riding his' own bicycle, an unknown man came up and pulled him off the bicycle. The man thought that the bicycle belonged to him. When Walker told the man that the bicycle belonged to him (Walker), the man realized that he was wrong and walked off. The man said that he was going to kill whoever took his bicycle. Walker identified the man as the person in the still shot of the store video. He stated that the man was wearing a white shirt and black shorts. Walker and Broussard rode the bicycles back to Brous-sard’s grandfather’s house. A short time later, Walker saw the unknown man, accompanied by two other men, again in the neighborhood, looking for his bicycle. He found the bicycle across the street, behind a house. The man then rode his bicycle up and down the neighborhood a couple of times. Shortly thereafter, Walker heard gunshots. He ran around the corner and saw Jeanmarie lying on the ground.
Girard Broussard corroborated Walker’s testimony as to the events that led up to the shooting. However, Broussard testified that Albert Davis was also in front of his grandfather’s house when he, Walker and Jeanmarie decided to go to buy beer and cigarettes, but Davis did not go with them to the store.
Albert Davis corroborated Broussard’s testimony that he, Walker, Broussard and Jeanmarie were talking in front of Brous-sard’s grandfather’s house when the others decided to go to the grocery store to buy beer. Walker rode his bicycle while Broussard and Jeanmarie rode on Jean-marie’s bicycle. Davis testified that Jean-marie returned from the store first but was on a different bicycle. Jeanmarie, 13who appeared nervous, asked Davis if anyone had come looking for him. Davis told him that no one had come looking for him. When Davis turned around, Jean-marie was gone. Walker and Broussard came back a short time later and told Davis that Jeanmarie had taken someone’s bicycle. A few minutes later, a man came by saying he was going to kill whoever took his bicycle. The man was walking up and down the street at first, but then came back riding on a bicycle. There were two other men with him. Davis said the man was wearing a white shirt and black gym shorts and appeared to be clutching something in his waistband. The man went down Mazant Street, and then Davis heard gunshots. Davis went around the corner and saw Jeanmarie lying on the ground. Davis went to Jeanmarie and held him in his arms. Davis saw the man pass one more time and heard the man say that he told them he was going to get the guy who stole his bicycle. The night of the incident Davis went to the homicide office and gave NOPD Detective Michael Cochran a statement. Davis identified Haynes at trial as the person on the bicycle who said he was going to kill Jeanmarie.
Det. Cochran testified that he obtained an audiotaped statement from Davis the night of the shooting and one from Ranz Jefferson, another person with information about the case, ten days after the incident. Det. Cochran identified both audiotaped statements at trial. He testified that Jefferson provided him with the name of “Hayne” as a potential suspect. He ran the name through the database and found a photograph of a person with that name. He put the photograph in a photographic lineup. However, Jefferson did not identify anyone in that lineup. |4Once Det. Cochran verified that the suspect’s last name was “Haynes,” he located a photograph of the defendant and put it in a photographic lineup, which he showed to Jefferson. Jefferson identified Haynes as the perpetrator. While Jefferson was at *1086 the police station giving a statement to Det. Cochran, Jefferson received a telephone call from Haynes on Jefferson’s cell phone. Haynes was placed on speaker phone, and Det. Cochran heard the conversation between Jefferson and Haynes. Haynes told Jefferson that he was hiding from the police and that the gun he used was at his aunt’s house. Det. Cochran obtained a search warrant for the Haynes’s aunt’s residence. When they executed the search warrant, the detective spoke with Haynes’s aunt and learned that Haynes lived there. However, the gun was not found at the residence, and no evidence was collected.
Det. Cochran conducted a photographic lineup with Davis. Davis could not identify Haynes in the photographic lineup. However, Davis identified Haynes in a still shot of the video taken from the grocery store. Det. Cochran noted that Haynes had dreadlocks in the photograph used in the photographic lineup but had short hair at the time of the incident. The day after the incident, Det. Cochran received a telephone call from Davis, indicating that there was a spent bullet that was still on the murder scene. Det. Cochran relocated to the scene, secured the bullet and called the crime lab. The crime lab technician came out to the scene, photographed the spent bullet and secured the evidence. At trial, the detective identified the bullet, a .38, caliber, found at the scene.
IsRanz Jefferson testified that he knew both Haynes and Jeanmarie from playing basketball with them. A few days after the shooting, Jefferson was sitting outside his house when Haynes approached him and asked Jefferson to go to the store for him. Haynes appeared very nervous. Haynes asked Jefferson if he could keep a secret and then proceeded to tell Jefferson that he shot Jeanmarie. Haynes told Jefferson that Jeanmarie had stolen his bicycle; that he got his bicycle back; and that he shot Jeanmarie four to five times. Haynes told Jefferson that he shot Jean-marie in the back when he tried to run. Haynes had shown Jefferson the weapon, a .38 caliber handgun, a few weeks before the shooting. Haynes did not have the gun on him when he told Jefferson about the shooting. Jefferson asked Haynes why he shot the victim. Haynes stated that he shot Jeanmarie because he felt disrespected. Jefferson stated that he met with Det. Cochran, gave him a statement and identified Haynes in a photographic lineup, because he was tired of seeing murders. Jefferson stated that while the photograph in the lineup showed Haynes with dreadlocks, Haynes did not have dreadlocks at the time of the shooting. When Jefferson was speaking with Det. Cochran, he received a telephone call from Haynes. Jefferson put the speaker phone on so Det. Cochran could hear the conversation. Haynes told Jefferson that the gun was at his aunt’s house. Jefferson identified Haynes at trial.
Dr. Samantha Huber, a forensic pathologist with the Orleans Parish Coroner’s Office who conducted the autopsy, testified that Jeanmarie suffered a total of five gunshot wounds. She said that the gunshot wounds to the right chest | fiarea and left side of the head were potentially fatal, and the cause of death was multiple gunshot wounds. She was able to recover one of the bullets and multiple bullet fragments. Dr. Huber verified there was no stippling or soot around any of the entry wounds, suggesting that the weapon was at least twelve to eighteen inches away from the victim when the victim was shot.
NOPD Det. Greg Hamilton testified that he participated in the investigation and obtained a surveillance video from Mike’s Grocery on St. Claude Avenue. He had *1087 the video footage placed on a disk. The video was played for the jury.
The parties stipulated that if Meredith Acosta testified she would be qualified as an expert in firearms examination and that her testimony would be consistent with her report, which introduced into evidence at trial. The report revealed that the spent bullet found on the scene and one of the bullets retrieved during the autopsy were fired from the same weapon.
A review of the record for errors patent reveals that the trial court failed to impose defendant’s life sentence without benefit of probation or suspension of sentence. La. R.S. 14:30.1 requires that the life sentence be served without benefit of probation, parole or suspension of sentence. The minute entry indicates that the trial court imposed the sentence without benefit of probation, parole or suspension of sentence. However, the sentencing transcript reveals that the trial court imposed a life sentence without the benefit, of parole. Generally, when there is a conflict between the minute entry and the trial transcript, the transcript controls. State v. Jackson, 2008-0286 (LaApp. 4 Cir. 4/29/09), 11 So.3d 524.
|7In instances where the statutory restrictions were not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court. La. R.S.15:301.1(A); State v. Williams, 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. Consequently, this Court need not correct this error.
No other patent errors were found.
In his first assignment of error, Haynes argues that the State failed to prove that he was the person who killed Jeanmarie. Specifically, he contends his identification as the perpetrator was erroneous.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (LaApp. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d at 1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the | ^conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La. 1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, but rather is an *1088 evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987). If a rational trier of fact reasonably rejects the defendant’s hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La.1984).
“A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.” State v. McMillian, 2010-0812, p. 6 (La.App. 4 Cir. 5/18/11), 65 So.3d 801, 805 (citations omitted).
In addition, “[a]s a general matter, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification.” State v. Neal, 2000-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658. A positive identification by only one witness is sufficient to support a conviction. Id. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 |fl(1977): (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. State v. Jones, p. 7, 2010-0018 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 832.
In the present case, there was sufficient evidence for the jury to find that Haynes was the person who shot and killed Jean-marie. Ranz Jefferson testified that Haynes admitted that he had killed Jean-marie for stealing his bicycle. Jefferson identified Jeanmarie in photographic lineup and at trial. Albert Davis also identified Haynes as the person he initially saw walking and then riding a bicycle in the area at the time of the shooting. Davis testified that Haynes stated that he was going to kill whoever stole his bicycle. Immediately after the shooting, Davis saw Haynes speedily leaving the scene and heard Haynes say that he had said that he was going to kill the person who stole his bicycle. Davis identified Haynes from the still shot of the surveillance video from the grocery store. Walker and Broussard both testified that the person in the still video shot was the person who stopped them as they left the grocery and who they later saw in the neighborhood looking for his bicycle.
Davis’s testimony establishes that he had sufficient time to observe Haynes, as Davis stated that Haynes was in the neighborhood for a while, first looking for his bicycle and then looking for Jeanmarie. Davis also testified that he saw Haynes immediately after the shooting as Haynes passed by on his bicycle. Davis also positively identified the defendant in the still video shot and at trial. Likewise, Walker and Broussard’s testimony reflects that both had an encounter with Haynes Imprior to the shooting and saw him riding in the neighborhood for several minutes prior the shooting.
The testimony provided by the witnesses was sufficient for the jui’y to conclude, beyond a reasonable doubt, that Haynes was the person who shot and killed Jean-marie. This assignment is without merit.
In the second assignment of error, Haynes suggests that the trial court abused its discretion when it overruled his *1089 objections to the State’s improper statements during rebuttal argument. Haynes contends that the prosecutor made improper comments about the likelihood that he would threaten or harm the witnesses who identified him if he was found not guilty. Haynes objected to these statements, and the trial court overruled the objections. Haynes then requested a mistrial, which the trial court denied.
During the defense’s closing argument, Haynes’s counsel questioned the identifications made by the witnesses and specifically noted that the State did not have Walker and Broussard identify Haynes during trial. Defense counsel suggested that Jefferson was lying, and the other witnesses, either intentionally or accidently, incorrectly identified Haynes as the person riding the bicycle in the neighborhood.
During rebuttal argument, the prosecutor made the following remarks to which defense counsel objected:
There’s no doubt, ladies and gentlemen, that Frank Haynes murdered Barry Jeanmarie that night over a bicycle. And it’s sad that that happens around here. But luckily we have witnesses that are strong enough to come in here and tell you what they saw. They honestly tell you what they saw. If they can’t say for certain that that’s him, they say honest I can’t. But I know what I saw and I know what I heard. I know he was that guy. I know the shooter is this guy. I know this guy is the guy who threw my father down on the bicycle. I’m going to tell you what I know because I’m going to tell you the _|_ytruth. There are no lies, there are no stories bing (sic) concocted. Four brave men came in here and entrusted their story of what happened that night to you. That is scary. Like I said, if you go out tonight, they’re probably sitting on that wood. And you better believe that if you let him out, he’s going back to that neighborhood.
MR. BELJEAN: Objection, Your Hon- or.
THE COURT: Overruled.
BY MR. HUFFT: His family is here, he’s here. Those men are entrusting you, the State has presented its case to you.
MR. BELJEAN: Objection, Your Hon- or. This is far beyond—
THE COURT: Overruled.
The defendant subsequently sought a mistrial, which the trial court denied.
MR. BELJEAN: Judge, I did object during Mr. Hufft’s rebuttal closing. At this time I’m going to make a motion for mistrial. Mr. Hufft said to the jury that if the jury lets Mr. Haynes out of jail, in other words if they find him not guilty, that he will return to the area and kill the witnesses.
THE COURT: No, he didn’t say that.
MR. BELJEAN: He did, Judge.
THE COURT: No, he didn’t. He said multiple things. He said he would return to the area. He said that if you let him out, he didn’t say out of jail, he said let him out. I was paying attention. He may have — that may have been the reference to some extent that he was trying to make that if you let him out, something bad may happen again. But he did not specifically say that if you let him out, that he’s going to go do something to the witnesses. He did not specifically state that.
MR. BELJEAN: Nonetheless, Judge. That is the absolute only insinuation that the Jury could have got (sic). Closing arguments are not to frighten the jury and scare the jury. Closing arguments, as the court instructed, are to present for the jury their consideration and their conten *1090 tion about what the evidence has shown or not shown.
THE COURT: I agree.
MR. BEL JEAN: About what the evidence showed or not showed, reflected in that statement that was a statement that frightened the jury, that gave them to deliberate based on fear and fashion, which the Court would then instruct that they’re not to do. It was improper. It was unreasonable and it is basis for a mistrial.
I12THE COURT: Motion for mistrial denied.
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, cert, denied, Casey v. Louisiana, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000), citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing argument that referred to “smoke screen” tactics and defense as “commie pinkos” was inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even where the prosecutor’s statements are improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 396. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Huckabay, 2000-1082, p. 30 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093,1110. See also State v. Draughn, 2005-1825 (La.1/17/07), 950 So.2d 583. As the Court noted in Draughn:
Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor’s comments lies in the sound discretion of the trial judge. State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. 11sMoreover, a trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981).
Draughn, 2005-1825, p. 44, 950 So.2d at 614.
In State v. Jones, 2010-0018, supra, 51 So.3d 827, the defendant argued that the prosecutor made an improper comment during rebuttal when the prosecutor made a statement that a witness, Rasul, testified on behalf of the defendant because of Ra-sul’s fear of the defendant. The Court noted that defense counsel discussed Ra-sul’s testimony that exculpated the defendant. Defense counsel stated that Rasul was on probation for a cocaine conviction, and that Rasul’s probation could be revoked if the prosecution were to charge him with perjury. Defense counsel then suggested that Rasul had nothing to gain by testifying on behalf of the defendant. Defense counsel continued:
He really didn’t owe this man anything. If anything, that if he was scared that the man actually was the one that was doing it, he wouldn’t show up. He would definitely go to jail, if he did it. But he said this isn’t the man.
During rebuttal, the prosecutor responded:
*1091 Let’s talk about [Mr. Rasul’s testimony] a little bit. Mr. Rasul admits that he still lives in the same neighborhood. He stays in the same neighborhood. We can certainly understand why he would come into court today and say that’s not him. That makes sense, and the police officer told you in his testimony that he was scared. He was scared at first to identify him. He wasn’t hesitant. There was no doubt in his mind that he was scared. And we can understand that. And we can certainly understand why he would come in here, in court today while he lives on the street in that neighborhood and testify for this man, his dealer. There are several reasons. We talked about those in voir dire, too ... What is he afraid of? Retaliation. Isn’t it reasonable to understand why he might come in here and change his mind today? And let’s think about it. Moments after the incident, within moments he says that’s the guy, and we talked about that in voir dire. If somebody said, well, if that’s when you’re not thinking about the consequences is your reaction [sic]. He’s already been busted. He’s admitted it. He’s got the rock. He admits he bought it. He says, that’s the guy. Years later, he comes to court after thinking about that, and after thinking about the consequences of his actions—
| uId. at 10-11, 51 So.3d at 833-834. Upon review, this Court held that the prosecutor’s comment was “an arguable interpretation of the testimony adduced at trial.” Id. at 14, 51 So.3d at 835.
In the present case, the prosecutor’s rebuttal remarks are a response to defense counsel’s arguments questioning the credibility of the witnesses. However, the prosecutor’s statement about Haynes’s returning to the neighborhood could be interpreted as suggesting that if Haynes is released, he will return to the neighborhood to seek out the witnesses.
While the statement may be improper argument, given the overwhelming evidence pointing to Haynes as the perpetrator, we cannot say the argument influenced or contributed to the jury’s verdict. As stated above, Haynes told Jefferson that he committed the crime, shooting Je-anmarie four to five times. Dr. Huber confirmed that Jeanmarie was shot five times. Jefferson would not have known-that the victim was shot five times if Haynes had not admitted the crime to him. Additionally, Davis positively identified Haynes as the person whom he saw walking and then riding a bicycle in the neighborhood immediately prior the shooting. Davis testified that he heard Haynes say that he killed the person who took his bicycle. Walker and Broussard also positively identified that the person in the still video shot was the person who came after them in search of his bicycle. Both men testified that they saw that person walking and then riding a bicycle in the neighborhood. They also stated that they heard the person say that he was going to kill the person who took his bicycle. Walker and Broussard testified that they knew Jean-marie had taken the defendant’s bicycle.
The assignment of error is without merit.
| ^Accordingly, for the reasons stated herein, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. See La. R.S. 14:30.1