730 So.2d 983 (1999)
STATE of Louisiana
v.
Willie HARGE.
No. 98-KA-1321.
Court of Appeal of Louisiana, Fourth Circuit.
February 17, 1999.
*984 George A. Blair, New Orleans, Louisiana, Attorney for Defendant/Appellant Willie Harge.
Harry F. Connick, District Attorney, Charles E.F. Heuer, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Attorneys for the State of Louisiana/Appellee.
Court composed of Chief Judge ROBERT J. KLEES, Judge MOON LANDRIEU and Judge PATRICIA RIVET MURRAY.
MURRAY, Judge.
Defendant, Willie Harge, was charged by bill of information with indecent behavior with a juvenile, a violation of La.Rev.Stat. 14:81. He pled not guilty. A jury found him guilty of attempted indecent behavior with a juvenile, and he was sentenced to serve three years at hard labor with credit for time served. The sentence was suspended and Mr. Harge was placed on five years active probation with special conditions. Because we find that improperly admitted evidence contributed to the verdict, Mr. Harge must be afforded a new trial.

STATEMENT OF THE FACTS:
Edwin Coleman testified that he lives on one side of a double house and Willie Harge lives on the other side. He has known Mr. *985 Harge for five or six years. His granddaughter, C.C.[1], who was eight years old at the time of trial, lives with him. He stated that Mr. Harge often took C.C. for a ride or to get a hamburger.
On March 27, 1997, sometime before noon, C.C. went with Mr. Harge to buy breakfast. Later that afternoon, between 2:00 and 3:00, C.C. ran into the house upset and nervous. She told Mr. Coleman that Mr. Harge had tried to pull her skirt down and that he exposed his penis to her. She said that as this was happening, Traig, Mr. Harge's stepson, walked into the room and she ran. Shortly thereafter, Mr. Coleman went next door to speak to Mr. Harge, but Traig advised that his stepfather was asleep. Mr. Coleman then called the police. Before they arrived, Willie Harge came to Mr. Coleman's house to ask if he needed anything from the grocery. When C.C. saw him she ran into the washroom. Mr. Coleman testified that Mr. Harge appeared glassy-eyed at that time.
On cross-examination, Mr. Coleman admitted that C.C.'s older sister had been removed from his care because of allegations his daughter had made. He denied that Mr. Harge told him he caught C.C. going through his wife's jewelry box, and that he ran her out of the house. He testified that he had never known C.C. to be a liar.
Clayton Stanton testified that he has known Willie Harge for two or three years. On March 27, 1997, he was visiting Edwin Coleman when C.C. ran into the house scared. She told her grandfather that Mr. Harge pushed her onto the bed, tried to pull her dress down, pulled down his pants and exposed his private parts. Mr. Stanton also testified that C.C. hid in another room later that afternoon when Mr. Harge came to the Coleman house.
On cross-examination, Mr. Stanton testified that C.C. came into the house around 3:00 p.m. He heard C.C. tell her grandfather that "[s]omebody was coming on the porch to the door. And she said when heshe ran out the house."
Detective Darrell Smith, who is assigned to the New Orleans Police Department Child Abuse Section, testified that he was called out on an "indecent behavior, molestation of a juvenile case." He interviewed the victim, C.C.. During that interview she told him that Mr. Harge tried to fondle her and touch her in her genital area. She also told him that Mr. Harge exposed his private parts. Det. Smith testified he also interviewed C.C.'s grandfather and another witness who was at her grandfather's house on the day of the incident. Mr. Harge subsequently was arrested.
On cross-examination, Det. Smith testified that C.C.'s grandfather told him the incident occurred "about, maybe 2:30, 3:00. Something like that." He stated that C.C. told him she went to Mr. Harge's house to find her barrette. She did not tell him that she had been put out of Mr. Harge's house earlier that day. Det. Smith admitted that the initial report said nothing about Mr. Harge trying to pull C.C.'s panties down. He testified that C.C. told him that Mr. Harge held her with one hand and tried to pull her pants down with his other. Then he pulled out his penis. At that point he had let go of C.C. and was next to the bed, not exactly in it. Det. Smith admitted that no one on the scene told him that an adult had come into the Harge house and found C.C. there. When he spoke to Brenda Harge, the defendant's wife, the day after the incident she told him about her son, Traig. When Det. Smith interviewed Traig by telephone, he did not mention any of what C.C. had related about the incident.
C.C. was the last witness called by the State. She testified that she often went places with Mr. Harge. On March 27, 1997 she accompanied him to Burger King to purchase breakfast, which she ate at his house. After eating she played on the porch for a while, then went into her own house. She realized that her bow was missing, and asked her grandfather if she could go look for it. She found the bow in Mr. Harge's bedroom. She heard Mr. Harge approach, then he pushed her onto the bed and tried to pull her skirt down. He pulled his pants down and *986 took out his private parts. She stated that he had something on his finger, and she was trying to pull away from him. She was able to get away when Traig, Mr. Harge's stepson, came into the house. She then ran home and told her grandfather and her Uncle Clayton what had happened. Sometime later Mr. Harge came over to her grandfather's house, and she ran into the dryer room because she was scared.
On cross-examination she said it would be wrong to steal, and denied stealing anything. She testified that she told the police that Mr. Harge had pulled his pants and underwear down to mid-thigh. C.C. explained that Mr. Harge could not get her clothes off because she kept kicking him, but she admitted that she did not relate this to either the police or the doctor who examined her. She said that she told the police that Traig came in the house as she was pulling away from Mr. Harge. C.C. acknowledged that she knew that Mrs. Harge had told her grandfather that, unless Mrs. Harge was at home, she was not to be in the Harge house. Although C.C. admitted talking to the district attorney several times and going over her testimony many times prior to trial, she denied that anyone told her what to say.
Chronicles Edwards, Willie Harge's nephew, testified for the defense. He has lived with Mr. Harge for eight years. Mr. Edwards arrived home at approximately 1:45 p.m. on March 27, 1997. He saw nothing unusual at that time. C.C. was sitting in a rocking chair on the porch playing. When he went inside he found that Mr. Harge was in the bedroom, sleeping on his stomach; he did not wake up. Mr. Edwards explained that Mr. Harge takes medication and sleeps very hard. He described Mr. Harge's home as a shotgun double, and testified that one can stand on the porch and look straight through the house, especially into the bedroom. It was the family's practice not to lock the screen door or the wooden main entrance door; anyone could just walk in and out. Mr. Edwards was at the house approximately ten to fifteen minutes, and then left. Mr. Harge was still asleep, and C.C. was in the same spot on the porch.
On cross-examination, Mr. Edwards testified that he believed his uncle and Edwin Coleman were good friends. He acknowledged that Mr. Harge, whom C.C. called "Uncle Willie," often took the child with him to various places. He testified that Mr. Harge drank every now and then, mostly beer, sometimes gin. Mr. Edwards did not see Mr. Harge do any of the things that C.C. had alleged, and, as far as he knew, they did not happen.
Traig Varnado, Mr. Harge's stepson, also testified for the defense. On March 27, 1998, he was living with his mother and Mr. Harge. He testified that when he arrived home, at approximately 2:00 p.m., the windows, door and screen door were open. He walked in and saw C.C. sitting on the bed with her back against the headboard looking at television. They made eye contact, and "then she jumped up and ran out right past" him. Mr. Harge was not holding C.C. or restraining her in any way; he was asleep. Traig kept going through the bedroom to the back of the house. Mr. Harge did not awaken as Traig passed the bed. Traig testified that his stepfather took his medicine and usually napped about that time of day. Traig got the telephone, and went back on the porch, where he telephoned his mother to tell her he was home. Mr. Coleman came to the house and asked where Willie was. Traig told him that he was asleep, and Mr. Coleman said "Well, I'll talk to him later."
On cross-examination, Traig testified that his mother had a rule that C.C. could not come into the house if only her sons or Mr. Harge were home because it was not appropriate. He repeated that his stepfather and Mr. Coleman were good friends and that C.C. spent a lot of time with Mr. Harge. He testified that when he walked into the house, C.C. jumped out of the bed and ran past him. He believed that he startled C.C. when he came in, and that it was a natural reaction for her to run, because children will do that when they know they are someplace they should not be. He admitted that Mr. Harge takes a lot of medication for his heart condition, and that he drinks occasionally. Traig said he talked to a police officer by telephone the day after Mr. Harge was arrested. *987 He told the officer about C.C. watching television with her head against the backboard.
Brenda Harge, the defendant's wife, also testified. She described her house, and explained that one can see into the bedroom from the front door. She verified that she has a rule that no female children are allowed in the house when she is not home because she has three grown sons. She testified that she told the police officer that her son was home when C.C. was at her house the day before. He called Traig so that the officer could interview him over the phone.
On cross-examination, she admitted that she was not home at the time of the alleged incident, and did not know what happened before she arrived. She stated that Mr. Harge takes heart medication and drinks beer in moderation, but she has never seen him drink and take his medication at the same time.
Willie Harge testified on his own behalf. He stated that on March 27, 1997, he had just fallen asleep when he was awakened by a noise. He rolled over and saw C.C. going through his wife's jewelry box. He rushed her to the door and told her, "[y]ou know you're not supposed to be in here." He then went back to bed. Mr. Harge denied attacking C.C. or exposing himself to her.
On cross-examination he admitted that he did not tell Mr. Coleman about C.C. going through his wife's jewelry box. He said that did not want the child to be punished. He testified that he believed that C.C. made up the story about him because she had been caught in the house and "that probably was the only thing that popped in her mind and'cause she knows she was going to be in trouble."
The district attorney asked Mr. Harge if he had ever made sexual comments about little girls before. Mr. Harge denied having done so. The district attorney pressed him, asking if he had not made comments concerning little girls to Mr. Coleman on several occasions before this incident. Mr. Harge responded that he had not. The district attorney then asked if he had, on one particular occasion, told Mr. Coleman to "look at the titties on that girl." Mr. Harge answered no.
The defense rested, and the State called Mr. Coleman as a rebuttal witness. Mr. Coleman testified that Mr. Harge had made remarks to him regarding little girls "in less than three years" before this incident. Over defense counsel's objection, Mr. Coleman testified that:
It was made more than once. We would be sitting on the porch; and these little juveniles would pass, say, like, twelve, thirteen years old. And he said, `Oh, look at that.' Referring to their breasts. I said, `Man, that's only a child.' And he made the remark, `I'd take a chance.'
On cross-examination, Mr. Coleman said that he knew that when Mr. Harge said "[l]ook at them" he was referring to the girls' breasts. He stated he allowed C.C. to be in Mr. Harge's company even after he had made those remarks because "it just passed [his] mind." He thought C.C. was safe with Mr. Harge because he and Mr. Coleman were like brothers. He never thought that Mr. Harge would molest her. Mr. Coleman explained that both of the remarks he testified to were made at the same time, on only one occasion within three years before Mr. Harge's arrest. He admitted that the remarks did not bother him when he heard them.

DISCUSSION:
A review for errors patent reveals none.
Mr. Harge makes two assignments of error. He urges that there was insufficient evidence with which to convict him, and that the trial court improperly allowed the jury to hear inadmissible hearsay testimony.
The Louisiana Supreme Court stated that when issues are raised on appeal as to both sufficiency of the evidence and trial errors, the reviewing court must first make a determination as to the sufficiency of the evidence. In its determination of whether there was sufficient evidence to convict, the reviewing court may consider the allegedly improperly admitted evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If all of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the *988 reviewing court must then consider the assignments of trial error to determine whether the defendant should be afforded a new trial. Id.

A. Sufficiency of the Evidence
Mr. Harge contends that the evidence is not sufficient to support his conviction, because the testimony as to the victim's whereabouts was confusing, especially when weighed against his and Traig Varnado's testimony.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational fact finder's view of all the evidence most favorable to the prosecution must be adopted. The discretion of the trier of fact will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, 523 So.2d at 1309-1310. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319, 1324 (La.1992).
Indecent behavior with a juvenile is the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. La.Rev.Stat. 14:81.
Any person who has the specific intent to commit a crime, or does or omits an act for the purpose of and tending directly toward the accomplishing of his object, is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La.Rev.Stat. 14:27.
In the instant case Traig Varnado testified that he arrived home around 2:00 p.m. to find Mr. Harge asleep in the bedroom and C.C. sitting on the bed watching television. Mr. Varnado admitted that he made the assumption that the child was watching television because the set was turned on. When C.C. saw him she jumped off the bed and ran past him out the house. He was gone most of the day and had no way of knowing what had happened earlier.
Mr. Harge testified that he sent C.C. home earlier that day when he was awakened and found her going through his wife's jewelry box. He did not testify about C.C. being on the bed watching television and running off when Traig came in the room. He, however, denied having attempted to molest C.C. or unzipping his pants and exposing his penis to her.
C.C.'s version of the events of the afternoon of March 27, was quite different from that told by either Mr. Harge or his stepson. She denied that Mr. Harge had sent her home earlier that day because he caught her "fiddling" in his wife's jewelry box. She testified that Mr. Harge was trying to pull her panties down and was exposing himself when Traig came into the room. She was then able to break away and run home.
No one knows what really happened in the Harge house that afternoon except C.C. and Willie Harge. The child told one story; Mr. Harge told another. C.C.'s story was somewhat discredited by Traig Varnado's testimony, but Traig could not testify as to what happened in the bedroom immediately before he walked in. The jury heard all the testimony and evidently found C.C. to be credible. The credibility of witnesses is for *989 the trier of fact to determine. State v. Green, 613 So.2d 263 (La.App. 4 Cir.1992).
Viewing all of the evidence in the light most favorable to the prosecution we cannot say that no reasonable fact finder could have found Mr. Harge guilty beyond a reasonable doubt of attempted indecent behavior with a juvenile. Therefore, we conclude that the evidence was sufficient to support the conviction in this case.

B. Inadmissible Testimony
Mr. Harge also contends that Edwin Coleman's testimony regarding remarks Mr. Harge allegedly made regarding other juveniles should not have been admitted. Article 404(B) of the Louisiana Code of Evidence prohibits the introduction of evidence of other crimes, wrongs, or acts to prove the character of the person to show that he acted in conformity therewith. Mr. Harge argues that the testimony of the alleged remarks was offered as a prior act for this purpose and should have been excluded.
The State argues that the comment was properly admitted to show intent pursuant to State v. Prieur, 277 So.2d 126 (La.1973).
Before evidence of other crimes or acts can be admitted as proof of intent, three prerequisites must be satisfied: (1) the acts must be similar, (2) there must be a real genuine contested issue of intent at trial, and, (3) the probative value of the evidence must outweigh its prejudicial effect. State v. Romero, 574 So.2d 330 (La.1990); State v. Kahey, 436 So.2d 475 (La.1983). In addition, there first must be clear and convincing evidence of the commission of the other crimes and the defendant's connection with them. State v. Hatcher, 372 So.2d 1024 (La.1979); State v. Prieur, supra. If the testimony shows that the factual circumstances of the prior acts and the crime charged are virtually identical, the evidence of the other crimes is corroborative of the victim's testimony and establishes a system or plan. State v. Tolliver, 621 So.2d 17 (La.App. 2 Cir.1993).
In the instant case, we find that the statements allegedly made by Mr. Harge do not satisfy even one of the Prieur prerequisites. Intent was not a real, genuine contested issue in this trial; the "acts" were not similar; and the evidence had no probative value with regard to showing intent. Therefore, Prieur does not apply.
The State's reliance on State v. Terregano, 336 So.2d 859 (La.1976), to support the admissibility of Mr. Harge's alleged remarks is misplaced. In Terrogano, the defendant was charged with indecent behavior with a juvenile. The prosecution sought to introduce evidence relating to the defendant's making advances to the victim. The court ruled that the evidence of advances was "preparatory to the commission" of that crime and not evidence of other crimes. The rationale of Terrogano does not apply under these facts. The remarks allegedly made by Mr. Harge two to three years before the alleged incident on March 27, 1997, were not made with regard to C.C. It cannot be contended seriously that an isolated remark, in no way related to this victim, that was made at least two years before the alleged incident was preparatory to the commission of the crime with which Mr. Harge was charged. Mr. Coleman's testimony was offered for one purpose only, and that purpose was to show that Willie Harge had an "eye" for young girls, and was "willing to take his chances" in that regard. The trial court erred when it admitted this evidence.
The State contends that, if we find that this evidence was improperly admitted, such error was harmless, and does not warrant a new trial. We disagree.
The test used in deciding if a trial error is harmless is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The burden is on the State to prove that the admission of the improper evidence did not contribute to the conviction. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991); State v. Smith, 600 So.2d 1319, 1326 (La.1992).
When an appellate court rules that an error did not contribute to the verdict it has determined that the error was *990 unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Yates v. Evatt, 500 U.S. 391 at 404-5, 111 S.Ct. 1884 at 1893-94, 114 L.Ed.2d 432 (1991). In making such a determination an appellate court uses a two-part analysis: first, the court must determine what evidence the jury actually considered in reaching its verdict; second, it must weigh the probative force of all the evidence as against the probative force of the error. An appellate court cannot know what was in the juror's minds. Therefore, it must ask if the evidence considered by the jury was so overwhelming, that, beyond a reasonable doubt, the jury would have reached the same conclusion without the inadmissible evidence. It is not enough that the jury could have reached its verdict without relying on the erroneously admitted evidence. The error is harmless only if its effect is comparatively minimal in light of the total evidence. Yates, 500 U.S. at 404-5, 111 S.Ct. at 1893-94.
Applying that criteria to this case, we have considered all the record evidence, and cannot say that the improperly admitted testimony regarding Mr. Harge's alleged remarks was unimportant in relation to all the other evidence.
The State argues that the jury was free to disregard Mr. Harge's testimony in "light of the fact that it was so strongly contradicted by his own witness." Although we do not agree that Traig Varnado's testimony "strongly contradicted," the two were not totally consistent.[2] That inconsistency could have caused a reasonable juror to reject Mr. Varnado's testimony. This case then became a "swearing" contest between Mr. Harge and C.C. Mr. Harge's conviction is dependent solely upon C.C's credibility.[3] In light of the evidence in this record, the improperly admitted testimony by Mr. Coleman regarding remarks allegedly made by Mr. Harge could only serve to bolster the child's credibility. Consequently, Mr. Coleman's improperly admitted testimony was not minimal relative to the other record evidence, and we cannot say, beyond a reasonable doubt, that the jury would have convicted Mr. Harge without the improperly admitted evidence.
For the foregoing reasons, Mr. Harge's conviction must be reversed, his sentence vacated, and this case remanded for a new trial.
CONVICTION REVERSED; SENTENCE VACATED; REMANDED FOR NEW TRIAL.
NOTES
[1] To protect the identity of the minor child, only her initials will be used.
[2] The time at which C.C. supposedly was caught going through Mrs. Harge's jewelry box was never established. The child admitted that she was in and out of the Harge house on a number of occasions that day. It is possible that the jewelry box incident happened earlier in the afternoon, before she looked for her bow.
[3] We note that C.C.'s testimony, if believed in its entirety, would have supported a conviction for indecent behavior with a juvenile. Mr. Harge, however, was convicted of attempted indecent behavior with a juvenile.