TERRI F. LOVE, Judge.
hThe defendants Robert Krodinger and Michael Marshall appeal their conviction wherein a jury found the defendants guilty of two counts of simple rape. The issues raised on appeal include: (1) whether the trial court erred when it allowed the State *273 to introduce as evidence the DNA certificate of analysis; (2) whether the trial court erred when it failed to rule on the motion for severance; (3) whether the trial court erred when it refused to declare the defense witness unavailable; (4) whether there was sufficient evidence to support the conviction; and (5) whether a non-unanimous jury verdict is unconstitutional. We find that the trial court erred when it allowed the DNA certificate of analysis into evidence; however, the error was harmless. Additionally, the trial court did not err when it failed to rule on the motion for severance, nor did the trial court abuse its discretion by declaring the defense’s witness unavailable. Furthermore, this court finds that the evidence was sufficient to support the convictions and finds the non-unanimous jury verdict constitutional.

PROCEDURAL HISTORY

Robert Krodinger and Michael Marshall were indicted with three counts of aggravated rape in violation of La. R.S. 14:42. At their arraignments, the defendants pled not guilty.
The jury found the defendants not guilty on count one and guilty of the lesser responsive verdict of simple rape on counts two (anal) and three (vaginal). The trial court sentenced the defendants each to twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence. Both defendants filed individual motions for appeal.

FACTUAL BACKGROUND

The defendants Robert Krodinger and Michael Marshall, friends since childhood, were accused by the victim S.B.[1] of the crime of rape. From the outset, Marshall and Krodinger admitted to engaging in a sexual encounter with S.B.; however, both maintain the encounter was consensual.
Michael Marshall met S.B. in 2008 at an Alcoholics Anonymous (“AA”) meeting. S.B. identified herself at trial as a recovering alcoholic but at the time of the incident she was not in recovery. Additionally, around this time S.B.’s daughter was in an accident and hospitalized in the intensive care unit at University Hospital. S.B. testified that she started drinking heavily, a bottle of vodka a day, in 2008 after her daughter’s accident. Marshall was aware that S.B. did not have a vehicle and offered to drive S.B. from Slidell to New Orleans. S.B. accepted ^Marshall’s offer for rides and became acquainted with him. Marshall, whose wife at the time was incarcerated in Mississippi, claims the friendship between himself and S.B. developed into a romantic relationship during their weekly AA meetings. However, S.B. denied that they “hung out” together, and her only social contact with him aside from rides to New Orleans was having drinks at a nearby bar after an AA meeting was cancelled. The victim stated she cut off ties with Marshall in November 2008 because he made inappropriate sexual comments, which made her extremely uncomfortable.
Witnesses at trial testified to seeing Marshall and S.B. together on occasions, including one of S.B.’s neighbors and Marshall’s mother, with whom he lived. Marshall’s friend Michael Heinen also testified at a pre-trial hearing that on one occasion he observed Marshall and S.B. embrace each other.
Counsel for Marshall filed a writ to have Heinen brought to court to testify at trial as he had at the pre-trial hearing. Heinen, however, was not transported for trial. *274 The trial court judge declined to declare Heinen unavailable as well as declined to allow the transcript of the prior motion hearing testimony to be admitted as a hearsay exception.
On the day in question, it is undisputed that Marshall was bringing S.B. to detox at University Hospital where she would begin rehab under controlled conditions. Her rehab treatment was going to last at least thirty days. Marshall drove S.B. to the detox facility on March 12, 2009 because S.B. did not have ^transportation. S.B. testified that she drank the day and night before her scheduled admission to detox because she knew “this was [her] last time drinking.”
The events of March 12, 2009, are the subject of considerable dispute. The following facts are based on each witness’s testimony.
VICTIM’S TESTIMONY
On March 12, 2009, Krodinger accompanied Marshall to drug court in Poplarville, Mississippi. Afterwards, Marshall and Krodinger drove Marshall’s Jeep Cherokee to the victim’s house. En route to New Orleans, Krodinger drove Marshall’s Jeep, S.B. sat behind the driver’s seat, and Marshall sat next to her. The victim testified that as the Jeep proceeded onto Highway 11 Bridge, Marshall began removing the victim’s clothes. She testified that she resisted his advances and ordered him to stop. Marshall, however, overpowered her and vaginally raped her. When the Jeep reached the end of the bridge, Krodinger pulled to the side of the interstate. Kro-dinger straddled the vehicle console and anally raped the victim while Marshall forced her to perform oral sex on him. As she was raped, the victim stated she heard a knock on the vehicle window. She then heard a voice asking if anyone needed help. The victim crawled out of the vehicle into the ditch on the side of the road and yelled: “They’re raping me!” At trial, the victim identified the defendants. She denied ever having consensual sex or having a romantic or sexual relationship with Marshall prior to the rape. She also denied asking the defendants to have sex with her on the way to detox.
MICHAEL MARSHALL’S TESTIMONY
|fiMarshall testified the victim was in a flirtatious mood when he and Krodinger picked her up from her house. After stopping for gas, S.B. indicated that she “wanted her last hurrah,” which Marshall understood as an invitation to have sex. While Krodinger drove, S.B. and Marshall began kissing in the back seat. S.B. then removed her pants. Marshall was unable to achieve an erection[2], at which point, the victim pulled Krodinger’s hair and announced: ‘Tour boy went limp on me. Come back here and finish this off.” Kro-dinger drove the Jeep onto the frontage road and climbed in the back seat with the victim while Marshall returned to the front seat. Krodinger and the victim were engaged in sex until the Motor Assistance Patrol approached the parked Jeep.
ROBERT KRODINGER’S TESTIMONY
Krodinger testified that when they arrived at S.B.’s house, S.B. greeted Marshall in “a very cordial, friendly manner” as a “couple” would. Krodinger recounted that as they drove to New Orleans, the victim announced that she wanted to get loaded and get laid during the trip before going to detox. Krodinger testified that the victim began removing her clothes. A few minutes later, the victim reached forward and pulled Krodinger’s hair and started yelling in a loud voice, “Get back here now and finish what he can’t finish. I *275 want you back here now. Pull over.” Krodinger stopped the car and proceeded to the back seat. When he opened the rear door, S.B. pulled him into the car and told him that she wanted to have sex with him. Krodinger testified that Marshall looked frustrated and said R“Go ahead.” Marshall then got into the front passenger seat. While Krodinger and the victim were having sex, Krodinger testified that a man approached their vehicle and asked if they needed help.
CHRIS BERTHOLOT’S TESTIMONY
Chris Bertholot, a Motorist Assistance Patrol Operator, testified that on the morning of March 12, 2009, he encountered a vehicle stopped on I — 10 between Michoud and 510 westbound. The vehicle caught his attention because the vehicle’s flashers were not activated. Bertholot parked behind the vehicle and sounded his horn prior to approaching the driver’s side of the vehicle. He noticed a man (Marshall) seated in the front seat fastening his pants and a leg sticking out between the front and rear seats. Bertholot asked Marshall if everything was okay. Marshall said everything was fine. At that point Bertholot returned to his van, and he started filling out paperwork. As he did so, a naked woman jumped out the back of the vehicle yelling that she was being raped. Bertholot then pulled his van in front of the vehicle to block its escape. Bertholot demanded that the driver surrender his vehicle keys, which he did. Bertholot ordered the defendants to stand at the rear of the van while he placed the victim on the side of the van to shield her from traffic. Bertholot then called 911 and reported the incident.
DETECTIVE MERRILL MERICKS’ TESTIMONY
Detective Merrill Mericks testified that he was assigned to the New Orleans Police Department (“NOPD”) sex crime division on March 12, 2009. On that day, he responded to a call of rape on I — 10 in East New Orleans. When Mericks arrived 17on the scene, he noticed a dark colored Jeep Cherokee and a Motorist Assistance Patrol vehicle parked one behind the other on the side of the road. At that time, NOPD Officer Negrete and his partner had already advised the defendants of their rights, completed rights of arrestee forms, and the defendants were seated in separate police vehicles. The victim was crying hysterically in the back of an EMS unit and was brought to the hospital for a rape exam. Mericks called for a crime lab unit and had the Jeep impounded. Upon completion of photographing and processing the scene, Mericks ordered the defendants transported to police headquarters, where they both gave written statements.
During the investigation, Mericks obtained search warrants and obtained a buccal swab from each of the defendants. After speaking with the defendants, Mericks drove to the hospital to check on the victim. She was visibly bruised (old and new), combative, and intoxicated. S.B. explained the older bruises as being present because she bruised easily as a result of the amount she drank. Medical staff obtained a rape kit and advised Mericks that the victim was in the hospital for pre-scheduled detox.
Mericks verified that the victim had been drinking, though not the defendants. The detective noted in his report that the victim had been kissed, licked, and bitten, and that Michael Marshall was unable to achieve an erection. At trial, Mericks confirmed that the victim never told him that Krodinger straddled the vehicle console and anally raped the victim. Mericks also denied that the victim |stold him that Marshall forced S.B. to perform oral sex on Marshall. Mericks further explained that *276 the victim referred to Marshall as her boyfriend.
MIRTHA BUTLER’S TESTIMONY
Ms. Mithra Butler, a sexual assault examiner, testified that she performed a sexual assault examination on the victim on March 12, 2009. She noted in her report that when the victim arrived at the hospital at 11:20 a.m., she admitted to suffering from depression, panic attacks and hepatitis C. Ms. Butler’s report indicated that the victim related the facts of the rape and admitted being a heavy drinker. The victim was uncertain whether either attacker ejaculated, but she was certain that neither used a condom. Further, Ms. Butler noted that the victim did not suffer any tears, bleeding, or lacerations of her genitalia. The victim identified one of her attackers as a “friend” not a boyfriend.
At the request of the Louisiana State Police, Tiffany Meadows, a forensic biology expert employed by Bode Technology, reviewed the vaginal and rectal swabs taken from the victim in this case. Testing on the swabs proved positive for the presence of sperm, and she issued a report verifying her findings. Additionally, the Louisiana State Police Crime Lab tasked Bode Technology to conduct a forensic DNA analysis of the vaginal and rectal swabs from the victim as well as oral swabs from both defendants. The material gathered from the vaginal and rectal swabs matched the DNA profile from Robert Krodinger. Moreover, the testing excluded Michael Marshall as the contributor of the DNA profile in this case.
| ^ERRORS PATENT
A review for errors patent on the face of the record reveals none.

ADMISSIBILITY OF EVIDENCE

Counsel for Krodinger argues that Kro-dinger’s confrontation rights were violated when the trial court allowed the State to introduce inadmissible hearsay. Specifically, he argues that the trial court erred when it allowed the State to introduce at trial the DNA certificate of analysis instead of presenting the testimony of the analyst who performed the testing. This error, he contends, dictates a reversal of Krodinger’s conviction.[3]
The Confrontation Clause of the Sixth Amendment provides that, “[in] all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him” and limits the admission of testimonial hearsay statements at criminal trials to situations where the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.E.2d 177 (2004). Despite the significance of the term “testimonial” to the holding in Crawford, the Supreme Court expressly declined to give a complete definition to that term. Nonetheless, the Court provided a general discussion of “testimonial” statements. First, the Court enumerated the following three formulations of the “core class” of “testimonial” statements:
[i] “ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony |1(lthat the defendant was unable to cross-examine, or similar pretrial statements that declar-ants would reasonably expect to be used prosecutorially,” ...
*277 [ii] “extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,” ... [and]
[iii] “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.”
Crawford, 541 U.S. at 51-52, 124 S.Ct. at 1364. The Court further noted that “some statements qualify under any definition-for example, ex parte testimony at a preliminary hearing.” Crawford, 541 U.S. at 52, 124 S.Ct. at 1364. Additionally, the Court noted that “[statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.” Id. Finally, the Court noted:
Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.
Crawford, 541 U.S. at 68, 124 S.Ct. at 1374.[4]
Applying the guidance in Crawford to this case, the DNA certificate of analysis admitted at trial is testimonial. Nevertheless, even if the DNA certificate of analysis was inadmissible in this case, confrontation errors, including Crawford violations, are subject to Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.E.2d 705 (1967), harmless error analysis:
|nThe correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt.... Factors to be considered by the reviewing court include “the importance of the witness’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.”
State v. Wille, 559 So.2d 1321, 1332 (La. 1990).
Here, the identity of the sperm donor was not at issue. Krodinger testified at trial that he had sex with the victim. The only disputed issue was whether the sexual activity was consensual, as Krodinger claimed. The jury heard the conflicting testimony of the sexual encounter and chose to credit the victim’s testimony that Krodinger raped her. Therefore, although the trial court erred by allowing the DNA certificate of analysis admitted into evidence, the error was harmless. Accordingly, we find a reversal based on this argument unwarranted.

MOTION FOR SEVERANCE

Krodinger, in his pro-se appellate brief, argues that the trial court failed to *278 rule on his motion for severance. He contends the joint trial curtailed his ability to present a defense at trial thereby violating his constitutional rights. The record reflects Krodinger filed a motion to sever his trial from his co-defendant Marshall. Further, there is nothing in the record that indicates the trial judge ever ruled on Kro-dinger’s motion. Similarly, however, there is nothing in the record that indicates an objection was made on the lack of ruling.
It is well established that motions pending at the commencement of trial are waived when the defendant proceeds to trial without raising as an issue the lack of ruling on the motions. State v. Holmes, 2006-2988, p. 80 (La.12/2/08), 5. So.3d|1g42, 94. Accordingly, pursuant to Holmes, any error related to the motion to sever was waived. Nevertheless, Krodinger is not entitled to relief even if the motion to sever was not waived.
Severances are generally governed by La.C.Cr.P. arts. 704 and 705. A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. State v. Pru-dholm, 446 So.2d 729, 741 (La.1984). A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. Id. Where the thrust of the co-defendant’s testimony is simply to deny his own involvement and not implicate the other defendant, justice does not require a severance; this rule applies even though the co-defendant’s testimony may, by inference, be damaging to the other defendant. State v. Brown, 527 So.2d 12, 14 (La.App. 3 Cir.1988).
Krodinger does not point to any arguments made at trial that demonstrated any antagonism between his and Marshall’s defense. Neither blamed the other to exonerate himself. In fact, each admitted that he had sex with the victim. Furthermore, even if the defendants had pointed fingers at each other, that does not automatically make defenses antagonistic. Prejudice must be shown if defendants are to receive separate trials. State v. Williams, 416 So.2d 914, 916 (La.1982). The defendant argues that antagonistic defenses do not represent the only instances where the denial of a motion to sever will constitute an abuse of discretion; however, he has not identified what those instances are. Krodinger failed to show he suffered any prejudice from not having his trial severed from that of his co-defendant. Therefore, we find this assignment of error has no merit.
| AVAILABILITY OF WITNESS [11] Through counsel, Marshall argues that the trial court abused its discretion when it refused to declare witness Michael Heinen unavailable and when it denied his request to admit Heinen’s motion hearing testimony as an exception to the hearsay rule.
Unavailability is governed by La. C.E. art. 804, which provides in relevant part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
[[Image here]]
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A de-clarant is not unavailable as a witness if his exemption, refusal, claim of lack of *279 memory, inability, or absence is due to the procurement or wrong-doing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination ....
The record in this case indicates that the defense filed a writ of habeas corpus on March 17, 2011, for Heinen to be transported from Ouachita Parish Jail. The document bears a handwritten notation that it was “faxed to [Department of Corrections] DOC on 3/25/11 by Sgt. Hoffman.” On the morning of trial, the trial court learned and informed the defense that Heinen was not going to be transported. At the end of the first day of trial, March 28, 2011, the defense 114attempted to verify that the Department of Corrections was in possession of the writ. The defense received notification that it needed to contact the Department of Corrections by 8:00 a.m. the following day and also learned that Heinen could not be transported from Ouachita Parish to Orleans Parish within one day. The defense notified the court of the transportation problem at 5:30 p.m. on March 28, 2011, after the court had recessed for the day.
The next day, on March 29, 2011, the defense requested that the trial court order the transfer of the witness that day and allow him to testify the following day. Thereafter, the trial judge sought contact information for the responsible Ouachita Parish personnel to secure Heinen’s presence in court on March 30, 2011; however, the defense advised the judge that its investigator, who had the contact information, had been in a car accident and was otherwise indisposed. The defense requested that the witness be declared unavailable. The defense averred that it had spoken with the Department of Corrections and the sheriffs office on March 17, 2011, when it filed its writ to secure Heinen’s presence. On March 28, 2011, however, the defense avers that it learned that the Department of Corrections was not in receipt of the writ.
Refusing to declare Heinen unavailable, the trial judge explained:
... when we started this trial Monday morning I’m on the bench and I see the writ of habeus [sic] corpus. And across the top I see, “Ouachita will not transport.” I read that. I know it’s a defense witness. At about 9:00 o’clock, 9:30,1 pass it to Ms. Heisser, make sure the defense knows what this is saying.
Ms. Heisser walked over to defense table, showed the writ to everyone. We are in jury selection, then we start the trial. I don’t hear anything. I figure everything’s okay.
And then at 5:30 after the jury is gone for the day, I get notified that there is an issue with this witness. I say, “Who have you talked to, defense’ Tell me the name of the warden. Tell me the name of the person within either the parish jail or department of corrections that you talked to. Give me a phone number, I’ll call right now.” “Well |15Ms. Hall [defense investigator] has that information and she’s not here. She doesn’t have the information with her.” ... or it may not be Ms. Hall. “Somebody in our office talked to them. We don’t know who. We don’t know where it is. We don’t know what it is.”
*280 I get on [sic] information. I call to get the number. Mr. Pipes, I think, goes on his iphone to get the information from directory. And I tried for about twenty minutes after the jury has gone to try to get through. Deputy Rachael Heard here from Orleans Parish. I called Lieutenant Lawson as well to try to find out, I guess, who in DOC have you talked to.
And then this morning, I think, Deputy Heard, you said he [Heinen] is a DOC inmate. That’s been verified. But then again no one asked me to issue a new writ today to go get him for the defense.
I mean, it’s now 5:10 p.m. on the second day of trial and no one asked me today to renew any efforts to issue a new writ or fax the department of corrections in order to get him here.
... I can’t declare him unavailable because, in fact, he’s not ... It’s the party who needs the witness. It’s their obligation as frustrating as it is and convoluted with policy changes every month or annually on who’s going to get the inmates, who’s responsible. It is still your ultimate duty to find out who the proper person is that’s supposed to be ordered in ... if you’re not getting any relief, to then petition the Court for the Court’s leverage to be used. Again, because I don’t find any of those factors have been met, I cannot and will not declare Mr. Heinen unavailable.
In this case, the trial court concluded that the defense failed to exercise due diligence to obtain the presence of its witness. Based on the foregoing, we find the trial judge did not abuse her discretion in refusing to declare Heinen unavailable.
Even if there was error in the trial court’s refusal to declare the defense witness unavailable, the error was harmless. The gist of Heinen’s testimony was that he had seen Marshall “intimately” embrace the victim when she answered her front door. Marshall then went inside the victim’s house for ten to fifteen minutes. Marshall then told Heinen he had to drive him home because Marshall was returning to the victim’s house for a “booty call.” For Heinen, the observation was proof that Marshall and the victim had a sexual relationship. Marshall argues that because the testimony was contrary to the victim’s assertion that Marshall was |1fionly an acquaintance, it would have established an undisputed intimate relationship between Marshall and the victim and led to a not guilty verdict on all counts.
The jury listened to the evidence as presented by the victim and the defendants, and they found the victim’s testimony compelling. Moreover, even if Marshall and the victim had a previous sexual relationship, which the victim denies, the evidence and testimony at trial convinced the jury that the victim did not consent. For these reasons, the trial court did not abuse its discretion when it refused to declare the defense’s witness unavailable.
SUFFICIENCY OF EVIDENCE *281 consider the record as a whole since that is what a rational trier of fact would do. State v. Harge, 98-1321 (La.App. 4 Cir. 2/17/99), 730 So.2d 983. If a rational trier of fact could disagree as to the interpretation of the evidence, the view of the rational trier of fact of all the evidence most favorable to the prosecution must be adopted. The fact finder’s Indiscretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra. An appellate court is not called upon to determine if it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992).
*280 Both defendants argue that the evidence is insufficient to support their convictions. Whether evidence is constitutionally sufficient to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). An appellate court, however, may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). An appellate court is not permitted to consider just the evidence most favorable to the prosecution, but it must
*281 Both defendants in this case were charged with three counts of aggravated rape, in violation of La. R.S. 14:42(5). The jury, however, convicted both defendants of two counts of the lesser responsive verdict of simple rape. La. R.S. 14:43 defines simple rape, in pertinent part, as:
A. ... a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim’s incapacity.
With respect to sexual offenses, the victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 13 (La. App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045.
In this case, the victim denied ever having a sexual relationship with either of the defendants; and in fact, she said that she had never met Robert Krodinger before he raped her. She denied ever consenting to having sex with either defendant; and further, she stated that her inebriated state prevented her from | ¶ ¿protecting herself from their advances. The victim admitted that she started drinking alcohol early on the day of the incident in question, and Detective Mericks confirmed her testimony about her impaired state at the time he spoke to her, minutes after the alleged incident. Mericks noted that the victim was noticeably under the influence of alcohol and/or drugs.
In addition to witness testimony, physical evidence supports the victim’s claim of rape. Photographs taken of the victim at the time of the rape exam, show several bruises on her arms, supporting the victim’s claim of nonconsensual activity. Moreover, Krodinger’s DNA proved that sexual intercourse took place. The jury heard and weighed the testimony of the victim and the defendants and chose to credit the victim’s testimony over the defendants’. Viewing the evidence in the light most favorable to the State, the evidence was sufficient to support the verdicts. We find this assignment of error without merit.

CONSTITUTIONALITY OF A NON-UNANIMOUS JURY VERDICT

Marshall contends that the trial court erred in denying his motion to declare unconstitutional Louisiana’s statutory scheme which permits non-unanimous jury verdicts in non-capital felony cases. In particular, he claims that La. Const. Art. I, Sec. 17 and La.C.Cr.P. art. 782(A) violate his rights under equal protection.
La. Const. Art. I, Section 17(A) provides that a criminal case “in which the punish *282 ment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782(A) provides in part that “[c]ases in which punishment is | ^necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
In Apodaca v. Oregon, 406 U.S. 404, 410-11, 92 S.Ct. 1628, 1632-33, 32 L.Ed.2d 184 (1972), the United States Supreme Court stated:
[T]he purpose of trial by jury is to prevent oppression by the Government by providing a ‘safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge.’ Duncan v. Louisiana, 391 U.S. 145 at 156, 88 S.Ct. 1444 at 1451, 20 L.Ed.2d 491 (1968) ... ‘Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ... ’ Williams v. FloHda, supra, 399 U.S. 78 at 100, 90 S.Ct. 1893 at 1906, 26 L.Ed.2d 446 (1970). A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment. As we said in Williams, a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant’s guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where non-unanimous juries will convict or acquit. But in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served, (emphasis added).
In State v. Bertrand, 2008-2215, 2008-2311 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by Marshall in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
12oPue to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Bertrand, 2008-2215 at p. 8, 6 So.3d at 743.
This Court cited and relied on Bertrand in State v. Barbour, 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court erred in denying the defendant’s motion to declare La.C.Cr.P. ax*t. 782(A) unconstitutional as violating the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.
*283 As stated by the Louisiana Supreme Court in Bertrand, under current jurisprudence from the United States Supreme Court, non-unanimous twelve-person jury verdicts are constitutional; and La.C.Cr.P. art. 782(A) is constitutional. Accordingly, there is no merit in this assignment of error.

DECREE

We find that the trial court erred when it allowed the DNA certificate of analysis into evidence; however, the error was harmless. Additionally, we find that the trial court did not err by failing to rule on the motion for severance, nor did the trial court abuse its discretion by refusing to declare a witness unavailable. Furthermore, the evidence was sufficient to support the convictions and a non-unanimous jury verdict is constitutional. Accordingly, we affirm the defendants’ convictions and sentences.
AFFIRMED

. To prevent public disclosure of the victim’s name, the victim is herein referred to by her initials pursuant to La.C.Cr.P. art. 473.

. Krodinger suffers from erectile dysfunction as a result of a prison brawl.

. The defense notes that prior to trial it filed a notice of objection to the State's notice of intent to use the certificate of analysis. La. R.S. 15:499, et seq. Hence, Krodinger put the State on notice that he wished to exercise his confrontation rights.

. Davis v. Washington, 547 U.S. 813, 822 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which involved a 911 call, enunciated the following rule regarding the classification of statements as "testimoniar’:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
126 S.Ct. at 2273.