EDWIN A. LOMBARD, Judge.
liThe defendant, Carl Labat, challenges the sufficiency of the evidence underlying his conviction for the murder of Travis Anderson. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.

Relevant Procedural History

Mr. Anderson was murdered in the parking lot of the International House of Pancakes (IHOP) in New Orleans East at 12150 1-10 Service Road in the early morning hours of April 19, 2010. On June 24, 2010, the grand jury indicted the defendant for the second degree murder of Mr. Anderson and indicted Sheena Edwards as an accessory to the murder. At his arraignment on August 20, 2010, the defendant pleaded not guilty. The trial court granted the motion to sever the trials of *667 the defendant and Ms. Edwards[1] on August 28, 2011. After a three-day trial (August 24-26, 2011), the defendant was found guilty as charged. He was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence on December 14, 2011. His appeal is timely-
| ¾Applicable Law and Standard of Review
La.Rev.Stat. 14:80.1 provides in pertinent part that “[sjecond degree murder is the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm.... ” La.Rev. Stat. 14:30(A)(1).
Pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review in evaluating sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Notably, when reviewing whether sufficient evidence supports a conviction, we are not called upon to decide whether we believe the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992). The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
“When the accused asserts justification as a defense to murder, the State bears the burden of proving beyond a reasonable doubt that the killing was not justified.” State v. Matthews, 464 So.2d 298, 299 (La.1985) (citations omitted). Therefore, on review the “applicable standard is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense or in defense of others.” Id. (citing Jackson v. Virginia, supra; State v. Faulkner, 441 So.2d 721 (La.1983); State v. Lynch, 436 So.2d 567 (La.1983)). |3Thus, in accordance with Jackson v. Virginia, if rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. State v. Green, 588 So.2d 757, 758 (La.App. 4 Cir.1991).

Relevant Facts

A disturbance erupted between the defendant and victim in the parking lot of Passions Gentleman’s club (“the nightclub”) in New Orleans East on the night of April 18-19, 2010. Both parties left the nightclub after the altercation, but the defendant subsequently shot and killed Mr. Anderson in the IHOP parking lot. The following evidence was adduced at trial.
Alexis Sandifer testified that in April 2010, she shared an apartment with her brother, Rio Sandifer, and Mr. Anderson’s sister, Isone “Sunny” Anderson, as well as Monica Edgar. Ms. Sandifer also worked with Ms. Anderson and Ms. Edgar, as well as Ms. Edwards, at the nightclub. She knew the defendant by the nickname “C” as the boyfriend of Ms. Edwards. According to Ms. Sandifer, the disturbance in the nightclub parking was caused by the defendant slapping Mr. Anderson’s girl *668 friend, a dancer named Stephanie. The dispute was heated, involving Ms. Sandi-fer’s brother brandishing a shotgun as he and Mr. Anderson stood outside the nightclub challenging the defendant to come outside. The situation was temporarily diffused when someone pulled the defendant’s F-150 pickup truck up to the door of the nightclub and the defendant left, along -with Ms. Edwards. Shortly thereafter, Ms. Sandifer and her brother left the nightclub with Ms. Anderson, returning to the apartment ‘they shared. Ms. Edgar also returned to the apartment. Soon after they returned home, Ms. Edwards arrived, shouting at Mr. Sandifer (who she was intimately involved with) to come outside. Ms. Sandifer |4saw a gun hanging out of Ms. Edwards’s purse and escorted her out to the apartment parking lot where she and Ms. Edgar tried to persuade Ms. Edwards to desist. During the course of her conversation with Ms. Edwards, however, Ms. Sandifer noticed the defendant off to the side “fiddling with the gun trying to put the clip in there.” When Ms. Edwards ran back upstairs to exchange words with Mr. Sandifer (who remained inside the apartment), the defendant walked over to Ms. Sandifer, voicing threats towards her brother and Mr. Anderson. Accordingly, Ms. Sandifer called Mr. Anderson and warned him not to come to the apartment.
According to Ms. Sandifer, twenty minutes after the defendant left with Ms. Edwards, she received a phone call informing her that Mr. Anderson had been shot at the IHOP which was located directly across the interstate from her apartment complex. She drove there and told the police officers on the scene that the defendant and Ms. Edwards had just left her home where they had made threats against the victim. She saw Theo Jackson, a friend of Mr. Anderson, sitting crouched on a curb in the IHOP parking lot with his hands on his head. Ms. Sandifer identified the defendant in court as the person who made threats against Mr. Anderson while in the parking lot of her apartment complex.
Ms. Anderson also testified, stating that she and her brother were originally from Memphis, Tennessee and that, at the time of the shooting, Mr. Sandifer was her boyfriend. She confirmed that a fight occurred between the defendant and her brother outside the nightclub on the night of her brother’s murder. According to Ms. Anderson, her brother wanted to “fist fight” the defendant because he (the defendant) had slapped his (Mr. Anderson’s) girlfriend. She stated that her brother did not like to be around guns and, thus, when Mr. Sandifer attempt to hand her brother a shotgun he retrieved from the trunk of his car during the nightclub |Bparking lot dispute, her brother refused to take it. Ms. Anderson testified that when the defendant’s friends drove up in his truck at the nightclub she saw one of them hand a gun to the defendant. Accordingly, because the defendant had a gun and there were approximately thirty people standing near him, she urged her brother to leave the scene.
Ms. Anderson recalled that they all left the scene before the defendant but soon after she arrived home with the Sandifers, Ms. Edwards came to the apartment threatening Mr. Sandifer. As Ms. Anderson watched from the apartment balcony, Ms. Sandifer tried to diffuse the situation. While she was watching Ms. Sandifer and Ms. Edwards, Ms. Anderson noticed the defendant, who was standing behind a tree, drop a gun and hurriedly try to pick it up. She observed the defendant’s truck parked by the tree and then heard him tell Ms. Edgar to leave with her child because everyone in the house was about to die. She also heard the defen *669 dant tell Ms. Sandifer to kiss her brother because it was going to be the last time she would see him. Accordingly, Ms. Anderson called her brother and told him not to come over or, if he did, not use his personal vehicle. When she tried to call him ten to fifteen minutes later, he did not answer his phone. Shortly thereafter, she received a call from her sister, Nicole Anderson, informing her that their brother was dead. She then went to the location of the shooting and, while at the crime scene, received a phone call from Ms. Edwards who initially extended condolences for the loss of her brother. However, when Ms. Anderson asked Ms. Edwards why her brother had been killed, Ms. Edwards hung up and then called back, stating “that’s what you get for fucking with [U]ncle “C’s,” before hanging up again. Ms. Anderson identified Uncle “C” in the courtroom as the defendant.
| RTheo “Jody” Jackson testified via deposition that he and Mr. Anderson were longtime friends. On the night of the murder, he drove Mr. Anderson to the IHOP to meet someone although he did not know who Mr. Anderson planned to meet. After they were seated in the restaurant, the defendant (a “light skinned” guy who Mr. Jackson recognized from the nightclub) came into the restaurant. Mr. Anderson got up to speak to the defendant. Mr. Jackson did not overhear the conversation, describing it as “brief’ and “quiet.” The defendant and Mr. Anderson then went outside of the establishment and, shortly thereafter, the defendant shot Mr. Anderson. Mr. Jackson ducked for cover along with other people in and around the IHOP, but observed shots coming from the dark late model pickup truck that the defendant arrived in and, after the shooting, saw the defendant jump into the truck and leave the scene. Mr. Jackson called 911 and went outside to where Mr. Anderson lay on the ground unresponsive.
Ms. Edgar also testified, confirming that she was a friend of Mr. Anderson, lived with Ms. Sandifer, and worked with Ms. Edwards, Ms. Sandifer, and Ms. Anderson at the nightclub. She knew the defendant as Ms. Edward’s “older boyfriend,” but reiterated that Ms. Edwards was also involved with Mr. Sandifer. Ms. Edgar testified about the initial argument between the defendant and Mr. Anderson, also stating that she saw someone hand the defendant a gun from his truck before he left the nightclub. According to Ms. Edgar, Ms. Edwards approached her and told her to leave the apartment because she (Ms. Edwards) was going to kill everyone there. Ms. Edgar left the nightclub with the San-difers, returning to their shared apartment where Ms. Anderson was present with Ms. Edgar’s child. Soon thereafter, Ms. Edwards arrived and told Mr. Sandifer to come outside to get what was coming to him. Ms. Edwards argued with Mr. San-difer, 17brandished a gun, threatened to kill everyone, and told Ms. Edgar to leave with her child. Ms. Edgar followed Ms. Edwards outside and saw the defendant standing outside in front of his truck with a gun in his hand. The defendant also told her to leave with her baby and told Ms. Sandifer to kiss her brother goodbye. Ms. Edgar then observed Ms. Edwards leave in a gold colored truck and the defendant leave in a black truck. Approximately thirty minutes later, she received a phone call informing her that the victim had been shot.
Yolanda Hayes, a 911 operator for the City of New Orleans on the night of the shooting, testified that she received three calls reporting the incident at the IHOP. She listened to the taped conversations and confirmed that the tapes at trial were in fact the calls that came in the night of the shooting.
*670 Detective Anthony Pardo of the New Orleans Police Department (NOPD), Homicide Division, the lead officer in the investigation of the murder of Mr. Anderson, testified as to the details of the police investigation. He confirmed that he arrived at the IHOP parking lot sixty to ninety minutes after the shooting and assisted in the processing of the crime scene. Detective Pardo stated that multiple nine millimeter shell casings and one live round were found in the area that night and, later, the manager of the IHOP reported that one additional shell casing had been found near the parking lot area. He also indicated that the video evidence, S-B2, was later retrieved by the NOPD video forensics department. He identified both the defendant and Mr. Anderson in the video. Detective Pardo also interviewed Ms. Anderson, Ms. Sandifer, and Mr. Jackson at the crime scene. While he was speaking with Ms. Anderson, she received a phone call from Ms. Edwards. Ms. Anderson placed the phone on speaker mode and he heard the entire conversation between Ms. Anderson and Ms. Edwards.
| ¡According to Detective Pardo, the defendant was not at the scene and no weapons were found at the scene around the victim. He conceded that he had no knowledge as to whether a gun had been removed from the scene by Mr. Anderson’s friends and that he had not questioned Mr. Jackson about whether he or Mr. Anderson possessed guns at the scene of the crime. Detective Pardo also acknowledged that he was not aware that Mr. Sandifer had threatened the defendant earlier in the nightclub parking lot.
Officer Carl Palmer, a NOPD crime laboratory technician, confirmed that he processed the crime scene on the night of the shooting, retrieving casings and fragments from around the victim’s body in the IHOP parking lot and, later, a shell casing from a flower bed nearby.
Cynthia Gardner, M.D., qualified by joint stipulation as an expert in the fields of medicine and forensic pathology, conducted the autopsy on the victim on August 19, 2010. At trial, she identified S-41, her autopsy protocol, and testified that the victim had a total of seventeen penetrating gunshot wounds, several of which caused fatal injuries to the victim. While the majority of Mr. Anderson’s wounds were not immediately fatal, Dr. Gardner opined that he had wounds that interfered with his breathing, causing him to bleed to death. Dr. Gardner also stated that at least one of the wounds was “instantly” fatal, that is, death was not immediate, but was certain to result several minutes post injury. In particular, she stated that “Wound E” entered through the right chest, exiting the left side of the back and causing injury to the diaphragm, the liver, the large intestine, a rib, and causing overall massive internal injury of the chest and abdomen. Dr. Gardner also opined that some of the gunshot wounds were consistent with ricochet penetration of a victim who was lying on the ground. She explained that usually if a person is |9the victim of a ricocheted bullet fragment and is in a standing position, the bullet fragments are usually found in the feet and ankles. However, she distinguished that the bullet fragments found in Mr. Anderson as being located in his stomach and left side of his torso.
Manieshia Hampton testified on behalf of the defendant, stating that she was his girlfriend and, that at the time of the shooting, they were living together. Ms. Hampton testified that the defendant owned a gun that he kept in their apartment. Ms. Hampton did not know Ms. Edwards and was unaware that the defendant was involved with Ms. Edwards at
*671 the same time he was living with her. Ms. Hampton stated that she did not go to the IHOP on the night of the shooting.
Donald Gray, also called as a witness for the defense, testified that he was a friend of the defendant and had gone with him to the nightclub. He denied seeing the defendant in an altercation or with a gun on the night of the shooting.
Finally, the defendant testified on his own behalf, indicating that he did not really know Mr. Anderson or Mr. Sandifer. He denied arguing, slapping, or fighting anyone in the nightclub and, further, having any conflicts with Mr. Anderson or Mr. Sandifer. The defendant asserted that no one gave him a gun at the nightclub and that he never pulled a gun on Mr. Anderson. According to the defendant, on the night of the shooting Ms. Edwards called him while she was engaged in a verbal altercation. He went to the location where she was — the Ghenault Creek Apartments — and told her to get in her car and leave the premises. He asserted that he never spoke to anyone at the apartment complex or brandished a gun. After he left the apartment complex, he went home but then decided he wanted to get something to eat and went with a friend to the IHOP which was about five minutes away from his home. He admitted having a firearm on his |1(lperson when he went to the IHOP. He entered the IHOP and waited to be seated by a hostess, but was not immediately seated. While he waited, Mr. Anderson approached him, saying “I should have killed you last night.” The defendant declared he was nervous and afraid for his life and decided to leave the restaurant. However, Mr. Anderson followed him and then appeared to be reaching in his pocket for something. The defendant claimed he was certain that Mr. Anderson was reaching for a gun, so he shot him before Mr. Anderson could harm him. When asked to describe Mr. Anderson’s gun, however, the defendant was unable to describe the make or model of the gun. The defendant testified that he left the scene after the shooting and went home. He claimed that he never knew he was wanted in connection with the shooting until he was arrested at his home in New Orleans East on August 4, 2010. The defendant also testified that he did not know the location of the gun used in the shooting because he threw it out of the window of the vehicle as he was fleeing the crime scene. He did admit to being aware that Ms. Edwards was arrested the day following the shooting at the IHOP, but denied knowing that he was wanted in connection with the murder.
The defendant’s mother, Mrs. Corinne Labat-Hingle testified that the defendant graduated from high school and attended Xavier University.

Discussion

The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction, State v. Wells, supra, and we will not disturb the factfinder’s credibility determinations on appeal unless they are clearly contrary to the evidence. State v. James, supra. In this case, the defendant conceded he shot the victim and, although he asserted that it was in self-defense, three witnesses testified as to his earlier altercation with Mr. Anderson and that the defendant was | nhandling a gun and making threatening remarks pertaining to Mr. Anderson and others shortly before the shooting. Thus, there is clear evidence that the defendant had the requisite specific intent to kill Mr. Anderson and did so. Moreover, in addition to the testimony that Mr. Anderson did not like guns and refused to handle them, no guns were found on his person or in his vicinity after the shooting and, although the shooting took place in a public *672 place, there is no evidence to support the defendant’s self-serving testimony that he thought Mr. Anderson was in possession of a gun. Accordingly, under the circumstances presented, the State met its burden of proof and, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the homicide was not committed in self-defense.

Conclusion

The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Ms. Edwards pleaded guilty to the crime of accessory after the fact on September 6, 2011, in return for a sentence of eighteen months, credit for time served.